**Margaret R. KINSELLA,**
**Plaintiff-Appellant,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.**

No. 82–3064.

United States Court of Appeals, Sixth Circuit.

Argued March 9, 1983.

Decided June 3, 1983.

Swygert, Senior Circuit Judge, sitting by designation, dissented and filed an opinion.

John P. McGinnis (argued), Bedford Heights, Ohio, for plaintiff-appellant.

Carolyn Watts Allen, Asst. U.S. Atty., Cleveland, Ohio, Daniel Mulvanny (argued), Chicago, Ill., for defendant-appellee.

Before EDWARDS, Chief Circuit Judge, KRUPANSKY, Circuit Judge, and SWYGERT,* Senior Circuit Judge.

PER CURIAM.

This is another of the many cases involving disability based upon back problems and arthritis; this in a now 57-year old female. She had previously worked as a sales clerk and department manager and when the store closed, she began collecting unemployment benefits. She contends in this application that she became disabled prior to the date of the closing of the store—but she certified to the Ohio's Bureau of Worker's compensation that she was available for work for a period of 13 weeks thereafter.

None of the judges on the panel had any doubt that she had some genuine problems. The question, of course, which was resolved against her by the Administrative Law Judge, the Appeals Council and the District Court was whether or not these problems were disabling to the point of preventing her from doing substantial work.

Appellant presented evidence from at least five doctors who considered her disabled. On the other hand, the government

relies upon reports by three doctors and a distinctly adverse opinion of the Administrative Law Judge in its contention that there is substantial evidence to support the Secretary's adverse holding. We quote hereafter the dispositive paragraph of the ALJ's opinion:

> The evidence shows that the claimant has degenerative disc disease and arthritis. She had right renal calculus and a bladder neck contracture in 1978 but this no longer causes her any problems. She is capable of doing numerous tasks around the house despite the fact that she complains of being unable to remain in one position more than approximately 12 minutes. Although she claims that she was unable to work in 1977, she filed for unemployment in 1978 exhibiting the fact that she felt that she was capable of working at that time. Her complaints of severe pain, as has been previously indicated, are not credible. It appears that she retains the residual functional capacity to lift up to 20 pounds, with frequent lifting or carrying of objects weighing up to 10 pounds, as well as a significant capacity to sit (she sat throughout the hearing which lasted 1½ hours without any apparent discomfort), stand and walk. Therefore, she has the residual functional capacity to return to her position as a sales clerk. She must, therefore, be determined not to be disabled within the meaning of the Act, as amended.

Our review of the medical evidence in this case demonstrates that the case has been decided upon substantially conflicting medical opinions. The majority of our panel would not have resolved this conflict as did the ALJ, if we were empowered to find the facts in this case. Our question, however, is whether or not there is substantial evidence to support the adverse decision reached by the Secretary and we find it impossible on this record to say there is no such evidence.

* Honorable Luther M. Swygert, Senior Circuit Judge, U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

The judgment of the District Court affirming the Secretary is hereby affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

I respectfully dissent. After a thorough review of the transcript and medical reports, I can only conclude that the Secretary improperly disregarded nearly all of the medical evidence, took Kinsella's statements about her daily activities out of context, made findings concerning the drugs prescribed for Kinsella which are not supported by the record, and ignored her testimony concerning the pain she suffered during the hearing.

There is no question, and the Secretary concedes, that Kinsella suffers from arthritis and degenerative disc disease. The only issue here is whether the pain caused by these diseases is so substantial that Kinsella does not retain the requisite residual functional capacity.

The Secretary found that Kinsella retains a significant capability to sit, stand, walk, lift twenty pounds in weight, and frequently carry ten pound objects. The only medical evidence to support this finding are the reports of two non-examining physicians. These reports stand in sharp contrast to the medical evidence offered by every physician who examined Kinsella. Dr. Tramer, the Secretary's own consulting physician, concluded that "[a]n ongoing status of a high degree of functional limitation is to be anticipated. Walking, sitting, bending, squatting, carrying of any significant degree are not within the capabilities of Mrs. Kinsella." Dr. Collins, who examined Kinsella one time, concluded that Kinsella should partake in mild daily exercises and that she avoid any heavy lifting or strenuous exertion. He observed that his examination

suggested no neurologic defect but that Kinsella's pain was probably secondary to diffuse osteoarthritis.[1] These examining physicians agreed with the conclusions of every treating physician. Dr. Irwin found that Kinsella remained in pain after surgery on her back. Dr. Pazirandeh instructed Kinsella not to bend, stand, or sit for prolonged periods. Dr. Nemunaitis observed that Kinsella's ability to rise from a squatting position was limited by pain and that she could not work because of the degenerated disc.[2] Because the evidence of examining and treating physicians is entitled to substantially greater weight than the evidence of non-examining physicians, *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir.1978); *Miracle v. Celebrezze*, 351 F.2d 361, 373 (6th Cir.1965); *see also Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977); *Martin v. Secretary HEW*, 492 F.2d 905, 908 (4th Cir.1974); *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir.1974), the Secretary's finding is based upon an improper weighing of the medical evidence.

The Secretary based his determination upon the claimant's testimony as to her daily activities, finding that "Kinsella is capable of doing numerous tasks around the house despite the fact that she complains of being unable to remain in one position more than approximately twelve minutes." The relevant testimony is as follows:

Q. [by Administrative Law Judge] You can't use your hands for—

A. [by Kinsella] Well, I can use them, but with difficulty. And, in the morning, I find dressing difficult. That's why I have to allow myself maybe 2, 3 hours to sort of get the kinks out.

\* \* \* \* \* \*

Q. Can you feed and dress yourself?

1. Dr. Collin's finding that the claimant had a good range with no pain or swelling in the major joints is not inconsistent with the other medical evidence because the pain Kinsella complained of was not in the major joints, but emanating from her back.

2. The district court's interpretation of Dr. Nemunaitis's report is clearly erroneous. After discussing the results of his examination and re-

porting disc changes, muscle spasm, and dysfunctional pain, Dr. Nemunaitis said: "She was treated conservatively with medication on a monthly basis from January through May of 1980 and continues to be symptomatic with minimal mechanical stress." The only fair reading of this statement is that Kinsella suffers dysfunctional pain when subjected to minimal mechanical stress.

A. Yes.

Q. Can you do your housework?

A. Well, my daughter helps me. I don't really do much in housework.

Q. Do you wash dishes?

A. Yes.

Q. Make the beds?

A. Yes.

Q. Do you dust?

A. Yes.

Q. Mop floors?

A. Yes.

Q. Cook?

A. Well, yes. What we eat is so little.

Q. What do you mean by that?

A. I wouldn't, I don't cook a meal anymore. We don't cook. I don't make like potatoes because there's too much involvement to peel it. And, if I have something it would be like frozen potatoes, or I would put a roast in, and then the family would, as they go along, slice it. It—

Q. Do you shop for groceries?

A. No.

Q. Who does?

A. My husband and my daughter.

Q. Give me a typical day from the time you get up in the morning until the time you retire. What time do you get up and what do you do after that?

A. Well, I get up about 5:00 because by then I need a pain pill, and I have a bowl of cereal, and I take a pain pill. And then, I lie down on the couch for about a ½ hour, and then I, I generally then go down in the basement, and my daughter is up by then, and we go downstairs, and I throw in a load of wash, and while that load is being washed, I take a shower and my daughter helps me 'cause I have trouble with my back. And then, when that wash is dry, she puts in the—I put it in the dryer and then I go upstairs and I watch Dave Patterson for a little while on the couch, sitting down. And then, if I'm going to have dinner, you know, whatever, whatever I'm going to have, like if I'm going to have a beef roast,

I'll put that in the oven then, or my patties —I'll make what I'm going to have in the morning. And then, I'll make the beds maybe about 1:00 o'clock. And, in the meantime, I'm sitting down all the, off and on. And, I hate to say it, but that's about my life.

Q. All right. What do you do in the afternoons?

A. Well, maybe I'll go out in the yard and just kind of walk around and look at my son's garden a little bit, and come in. Maybe by then the roast will be ready. I'll take it out and—

Q. What time do you have supper?

A. Well, we eat about 3:00.

Q. Your husband, too?

A. They work nights. My husband works nights now. He, he went on a night shift.

Q. How about the children? When do they work?

A. My son, my 20-year-old son works the night shift too for, with the government. And, my daughter goes to work about 12:30, and she comes home about 9:00. So, when she comes home, whatever is left—like meat and potatoes, she—they really, they kind of do for themselves.

Q. Okay. What time do you retire? Well, what do you do after supper?

A. I usually lay down on the couch and fall asleep. And then I get up and I pack or I sort of get together what my husband and my son are going to have for their lunch, at least put out what they're going to have. They pack their lunches, but I get out the fruit and things. And maybe I'll get a call on the phone or something.

*     *     *     *     *     *

Q. [by Kinsella's attorney] Okay. Other than—regarding your home life, other than such domestic chores as you—okay. With regard to domestic chores, what, what chores do you, did you formerly do that you cannot do now?

A. [by Kinsella] I did everything. I did the painting; I did the windows; I

washed walls; I would work 8 hours; I would come home, scrub the floors, wax the floors, did all the shopping, all of the baking, we entertained, we went out on weekends to parks. We were away on vacation.

Q. Okay. Now, do you do—are you able to do any—did you do any outside work at the house before?

A. No, no. I never did yard work outside. ·

Q. Okay. How about—you mentioned painting and scrubbing floors. Do you do those things now?

A. No.

Q. Washing windows?

A. No.

Q. Okay. How about marketing?

A. No. I don't do the marketing. I write the list, and my husband and daughter go.

Q. Okay. How about your—you formerly mentioned you entertained at home? I presume that means you would have friends in your home. Do you do that anymore?

A. Not really. Mostly, I can't. My son and my daughter, and I have one aunt—that's who we entertain. And, I had them 3 evenings a week for dinner, and that would be after work, and I would have them for a regular full nice dinner. No, I don't do that anymore at all.

Q. Okay. You mentioned you and the family would go to parks?

A. Yeah.

Q. Do you do that anymore?     .

A. No.

Q. Do you go anywhere with your husband now?

A. I don't go—

Q. I mean just—

A. —I don't go anywhere with anybody anymore.

Q. Does that mean you don't, you don't go to visit friends?

A. No.

Q. Do you go to the theatre or movies?

A. No.

Q. Do you have any trouble sleeping?

A. Oh, yeah, yes, yeah. I would say I wake every hour, every hour and a ½ all night.

\*　　\*　　\*　　\*　　\*　　\*

Q. Okay. Do you have any grandchildren?

A. Yes.

Q. How many?

A. One.

Q. Okay. Does the—do you normally have the grandchild over to the house or do you go over to your grandchild's?

A. Well, we did have Kevin—we used to have Kevin over like during the summer. I'd keep him maybe from Wednesday through Sunday, and you know, take him to the show, take him swimming.

Q. All right.

A. To a carnival, or things like that. I don't do this anymore. I can't do it anymore.

Q. Why?

A. The pain is terrible. We have a schoolyard right across the street from us, which I used to take him and he played in that all the time, and now I tell him, "I'll stand by the curb, and you run over there, and I'll watch you while you go over." Which, I like being with him; I'd rather be over there with him, but I, I know I can't do the walking and running after him.

This testimony was supported by Kinsella's husband.

Q. [by Administrative Law Judge] ... Can you describe for us, from what you've seen, from what you have observed, what your wife's condition is, what her limitations are, what she can't do and what she can do?

A. [by Kinsella's husband]   Well, she can't do much walking.

Q. How much can she do?

A. Well, in minutes or—I don't know how to describe it. Not very far. Like, in

the house, for instance, she'll, she'll be up for maybe 10 minutes, 12, then she'll sit down. And, she'll sit down for maybe 10 minutes, 15 minutes, get up. It seems to be a constant up and down.

Q. You mean she never sits more than 10 minutes or stand more than 10 minutes?

A. Maybe a little more. Fifteen, something like that, But, very close to that.

Q. Does she watch television programs?

A. She'll sit down to watch them, but not very long.

Q. How long?

A. Maybe 10 minutes or so.

Q. And again the same thing?

A. Up and down, right. She'll—

Q. What's her more comfortable position?

A. I don't think she has one.

Q. Now, does she drive?

A. She can drive; she doesn't drive much.

\* \* \* \* \* \*

Q. ... [d]oes your wife fix your meals for you?

A. No.

Q. She doesn't? Who does?

A. Nobody. I do.

Q. You do your own?

A. Right.

Q. All right. Who shops for groceries?

A. I do most of the time.

Q. Have you always done that?

A. No.

Q. When, when did you start?

A. She used to do the shopping.

Q. She used to do the shopping? When did you start doing the shopping?

A. Oh, I'd say within the last 3 years.

Q. Why?

A. Because she didn't seem to be able to get up. She always had some pain.

Q. Now, while she was working, who was doing the shopping?

A. While she was working, she was shopping.

\* \* \* \* \* \*

Q. You don't know how often she takes medication, do you?

A. Like weekends, I know that she wakes up at least a couple of times during the night, and she has to go get medication. This I know.

\* \* \* \* \* \*

Q. [by Kinsella's attorney] In regard to the household, what jobs or chores or activities around the house did she formerly do, say, prior to her back operation, that she doesn't do, or isn't able to do now?

A. Well, she used to cook regular meals for everybody.

Q. Does she do that now?

A. Oh, no, no.

Q. Has she since that time?

A. No.

Q. Okay.

A. And, she used to do the regular work. The vacuuming, and the laundry and everything by herself. She was, she was a very hard worker. She'd come home and she would do all of that.

Q. Okay. Now, who—for instance, who does the vacuuming?

A. Well, between me and, and my daughter, we usually do it.

Q. Okay. And, how about scrubbing the floors?

A. I do that.

Q. Washing the windows?

A. I do that.

Q. Taking out the trash?

A. I do that.

Q. Have you noticed any difference in your wife's ability, her ability to relate to you or to other members of the family since her back operation? For instance, short-tempered or anything of that sort?

A. Yeah. She's, she's become quite short-tempered.

Q. And, is that, can you trace that directly to about that period of time when she had this back operation, or sometime afterwards, or before that?

A. I noticed this when, as the pain seems to get worse, she seems to become more aggravated about things, anything—

\* \* \* \* \* \*

Q. Did she formerly, did she formerly ... watch TV or read? ... Read. Books, magazines—

A. Oh, read? Oh, yes, oh, yes, oh yeah. She used to read. She'd like movie magazines and she watched television shows. She's—

Q. The program—

A. —used to do those, yes.

Q. —from start to finish?

A. Oh, yeah.

Q. Okay. Is—does she read anything now?

A. I don't think she, she would read more than one article in a, in a paper or—not even an article in a magazine. She doesn't seem to sit that long. She'll pick something up and put it down within a few minutes, and she'll be—

Q. Does she seem to be interested in current events, what's going on in the world today, this type of thing?

A. We discuss it, and that's about all. She'll hear it on a radio that's in the—

Q. Okay.

A. —she has in the kitchen.

Q. At length.

A. No, no. It's just short—no long discussions anymore.

Q. Did you formerly—was your communication between the two of you pretty good formerly? I mean—

A. Oh, yes.

Q. —did you talk a lot?

A. Oh, yes.

Q. Has that changed?

A. Oh, yeah.

Q. In what way?

A. Well, it's—she just doesn't—she seems to go from one thing to another in short spurts now. It's nothing at any length.

Q. Did she formerly use to drive the car pretty regularly or fairly frequently?

A. Oh, yeah.

Q. Now—who does the driving now?

A. Well, I do most of the time.

These excerpts reveal that the Secretary's conclusion that Kinsella is capable of doing numerous tasks around the house is not supported by substantial evidence.

The Secretary based his determination upon the "fact" that the use of medication would indicate no more than moderate pain. The evidence before the Secretary was the following:

Q. [by Administrative Law Judge] All right. Do you have your medicines with you?

A. [by Kinsella] Yes.

Q. May I see them? And, how often do you take the Tolectin?

A. Three times a day.

Q. And, how long have you been taking them?

A. Well, I, I've been taking them since January. No, no. It wasn't January. Probably February he started me on that—he did. But, I had taken it with other doctors before. But, this is in a stronger dosage.

Q. All right, Now, this Tolectin has a notation on there that the prescription was filled on February, on April 29th, 1980, and you are not supposed to start taking them until 2 weeks after that date.

A. Because he, Dr. Jimenez had put me on steroids, and when I went to visit him, I was to take Imipramine for one week, and then the next week, I was to take Tendorel, and when I was through with those 2 medicines, I would then take the Tolectin, and he didn't want me mixing them because apparently, these steroids, they don't want to mix stuff with those.

Q. Now, how often do you take the Percodan?

A. I've taken Percodan at times as much as 8 times a day. I've taken it—generally, I try to keep it down to 4.

Q. How often do you take the Valium?

A. Oh, not every night. Maybe 2 nights a week, I take it. I only take it at night when I go to bed. That was the only time I've ever taken it.

Q. Do you take this regularly?

A. No.

Q. Are you still under the care of Dr. Conan?

A. Yes.

Q. How often do you see him?

A. I've been seeing him maybe every other week.

Q. What do you see him for?

A. I have a great deal of bladder infections.

Q. He's treating you for bladder problems?

A. Yeah. He's a urologist; he's a specialist.

Q. Now, how come he, he gives you Valium? Do you know?

A. Because when I started having these problems, he thought that would calm me down, Dr. Conan did. And, seeing as I had these prescriptions left, Dr. Jimenez said use it up, and then I will give you a refill. He wouldn't want to give me another refill unless I would throw them out.

Q. Well, what, what do you take the Percodan for?

A. Pain.

Q. Pain where?

A. In the back.

Q. How come Dr. Conan prescribes it?

A. 'Cause he is very aware of the pain that I've been having. He's seen me—

Q. Doesn't Dr. Jimenez agree with that?

A. Yes, he knows.

Q. And, how long have you been taking Percodan?

A. This is '80. Well, probably since, probably since June of, June or July of 1979.

Dr. Tramer, the Secretary's consulting physician, reported that "[h]opefully under the program which is being instituted, there will be a lesser need for Percodan which is a narcotic." Again, there is no evidence, much less substantial evidence, to support the Secretary's finding that the medication indicated no more than moderate pain.

The Secretary based his decision on Kinsella's appearance at the hearing and that her complaints of pain were not credible. This is how Kinsella described the pain:

Q. [by Administrative Law Judge] Okay. Now do you have any difficulty walking?

A. [by Kinsella] Yes.

Q. Can you describe that difficulty? What happens?

A. When I walk, it feels as though it's going to, as though my leg is going to spasm behind the knee, and I don't know —it's a funny way to describe this, but I feel if I walk like I have a diaper on—I have less trouble walking, as though if I throw my body, it doesn't seem to put as much pressure on the back and, and the pain in the back doesn't bother me as much if I walk kind of like, hop along, kind of—

Q. Do you have any difficulty standing?

A. Oh, yeah.

Q. What problems do you have in standing?

A. Well, it feels like a knife is cutting right into, into the, into the back of my back and into my spine, and the longer I stand, the worse it gets until I have to sort of stoop over and take the pressure off, sort of, off the, that leg and—

Q. How long can you stand before that happens?

A. Well, if I stand, by the time I'm standing 10 minutes, I, I feel that I've got problems.

Q. Do you have difficulty sitting?

A. Yes.

Q. What problems do you have sitting?

A. Well, it feels like there's something pressing on something all the time. It works into the hip—it's like a muscle tightening, and you sort of have to move your position around to sort of—

Q. But, you don't have pain?

A. It's a pain, but it's a dead kind of pain. The standing is a real sharp pain where you could—

Q. Do you have any difficulty using your hands?

A. Yeah, yeah. I have arthritis bad in this hand, and this—sometimes this hand is so bad I can't even pick up things; I can't button things; I have difficulty putting on—

Although Kinsella complained repeatedly during the hearing about the pain she was then suffering, the Secretary found that "she sat through the hearing which lasted 1½ hours without any apparent discomfort." Every treating physician found Kinsella's complaints of pain credible enough to require treatment. Her expressions of pain were supported by objective medical evidence. Testimony of a claimant concerning subjective pain and inability to perform even light work is entitled to great weight, particularly where it is supported by competent medical evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 409 (3d Cir.1979). *See also Lewis v. Weinberger,* 541 F.2d 417, 421 (4th Cir.1976).

The only apparent basis for the Secretary's credibility finding is that "[a]lthough she claims that she was unable to work in 1977, she filed for unemployment compensation in 1978 exhibiting the fact that she felt she was capable of working at that time." Of course, the mere receipt of unemployment insurance benefits does not prove ability to work. *Lackey v. Celebrezze,* 349 F.2d 76, 79 (4th Cir.1965); *Flores v. HEW,* 465 F.Supp. 317, 322–24 (S.D.N.Y.1978). Moreover, in the context of all the evidence, it was unreasonable to infer that the application for such benefits diminished the credibility of Kinsella's complaints of pain.

It is true the credibility determinations rest exclusively with the Secretary. *Myers v. Richardson,* 471 F.2d 1265, 1267 (6th Cir. 1972). But, viewing the record as a whole, *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir.1980), when such a credibility determination is based upon so slender a reed, and is contradicted by the overwhelming medi-

cal and testimonial evidence indicating disabling pain, the Secretary's decision is not supported by substantial evidence.

I believe we should not allow this manifestly unjust decision to stand.