815 F.2d 705
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Donald MAYNARD, Plaintiff-Appellant,
v.
Otis R. BOWEN, M.D., Secretary of Health and Human Services,
Defendant- Appellee.
 No. 86-3192.
 United States Court of Appeals, Sixth Circuit.
 March 2, 1987.
 
 Before LIVELY, Chief Judge, and WEICK and CONTIE, Senior Circuit Judges.
 PER CURIAM.
 
 
 1
 Donald Maynard appeals from the judgment of the district court affirming the Secretary's determination of the date upon which Maynard established a disabling impairment. For the reasons that follow, we affirm.
 
 I.
 
 2
 Maynard filed an application for supplemental security income on January 8, 1980. This application was denied initially and upon reconsideration. Maynard filed an application for disability insurance benefits on February 8, 1982, claiming inability to work as of October 2, 1978, due to back problems and seizures. This application was also denied. Maynard filed a third application for both supplemental security income and disability insurance benefits on September 28, 1982, claiming inability to work as of September 24, 1982, due to lower back problems and "eyes going bad." Upon subsequent motion by Maynard's attorney, the application was amended to allege an onset date of October 2, 1978. This application was denied initially and upon reconsideration. Maynard then requested an administrative hearing, which was held on April 14, 1983.
 
 
 3
 Maynard testified at the hearing as to his personal history, his work history and his ailments. Maynard was born on May 11, 1938. He has a ninth grade education. He last worked in October, 1978, as a truck driver. In addition to driving responsibilities, this job required him to load and unload crates of up to 100 pounds. His prior work experience includes employment as a laborer, roofer and gas station attendant over the past 15 years.
 
 
 4
 Maynard testified that he has been unable to work as of October, 1978, due to different problems with his health. In 1958, he was involved in a car accident which rendered him unconscious in a hospital for three weeks. He suffered a back injury in 1971 while working at a casket company. As a result of this injury, he stated that he needs to wear a back brace and takes daily medication for back pain. However, he has never been hospitalized because of this injury. He testified that he is able to sit for 15 to 20 minute periods and to walk approximately one block before his back begins to bother him. In addition to his back pain, Maynard further testified that he suffers from nervous problems, headaches and seizures. He takes prescribed medications for these problems. He stated that he had been hospitalized two or three times for nervous breakdowns, although not in the last couple of years.[1] His last seizure occurred four or five months prior to the hearing; however, he has never been hospitalized for seizures. Maynard further testified that he had lost 20 pounds over the last six months by not eating. When asked by the ALJ why a doctor's report in the record indicated that Maynard had previously stated that he had lost weight by jogging, Maynard replied that he might have been just "faking" the doctor. Maynard stated that he is able to sleep for four or five hour periods before waking from back pain. During a normal day he sits around the house, watches television and occasionally vacuums. He occasionally visits relatives residing within a block of his home.
 
 
 5
 The following pertinent medical evidence was introduced at the hearing. Maynard was admitted to Mercy Hospital on April 15, 1975, with a two-day history of hematuria (blood in the urine). X-rays revealed a normal chest and abdomen with spina bifida occulta of S1. Results of a pyelogram were normal. Maynard's hematuria subsided and he was discharged on April 18, 1975, with a diagnosis of hematuria, secondary to prostatitis and low back syndrome. He was placed on tetracycline medication for a one-week duration.
 
 
 6
 On January 21, 1981, Dr. Cameron, Maynard's osteopathic physician, submitted a report to the Ohio Bureau of Workers' Compensation. He indicated that he first examined Maynard on April 6, 1979, for complaints of back pain. He reported findings of marked spasms and tenderness of the lumbar region. An x-ray evidenced narrowing of the disc space at L5-S1, attempted lumbarization of the first sacral segment and spina bifida occulta at S1. Dr. Cameron diagnosed acute low back strain, lumbar ligamentous strain and probable lumbar radiculitis. He opined that Maynard was permanently and totally disabled due to Maynard's inability to walk, stand, bend, lift or sit for prolonged periods of time.
 
 
 7
 Maynard was hospitalized at Doctor's Hospital on August 4, 1981, for complaints of syncopal episodes. He was subjected to a complete medical evaluation, including two electroencephalograms and a brain scan. The initial electroencephalogram was on the borderline of normal; however, the second electroencephalogram was essentially normal. The computerized tomographic scan of the brain was also normal. Maynard's hospital course of stay was reported as quite satisfactory with essentially normal behavior and normal progress with no major complications. He was discharged on August 10, 1981, with instructions to see Dr. Cameron in one week. The final diagnosis was a history of syncopal attacks of undertermined etiology, a history of disability secondary to back disorder, chronic obstructive pulmonary disease with bronchitis and labile hypertension.
 
 
 8
 Dr. Mazo, another of Maynard's treating osteopaths, reported on September 4, 1981, that he had re-evaluated Maynard in his office subsequent to Maynard's August, 1981 hospitalization. In his report Dr. Mazo stated that Maynard denied having any prodoma or tonic-clonic movements, tongue biting, urinary or fecal incontinence, foaming from the mouth, or post-ictal lethargy during episodes of syncope. Dr. Mazo noted that Maynard's neurological exam was within normal limits revealing no focal deficits. He opined that he was at a loss to really explain Maynard's syncopal episodes.
 
 
 9
 Maynard was admitted again to Mercy Hospital on January 6, 1982, with complaints of a headache and of passing out the prior evening. An electroencephalogram was again performed and the results were entirely normal. All other tests resulted in normal findings except for a possible polypoid lesion of the left maxillary sinus. Maynard was discharged as improved on January 11, 1982, with a final diagnosis of possible tension headache and left maxillary sinus headache.
 
 
 10
 The record contains a second report from Dr. Cameron dated April 19, 1982, which was prepared approximately three weeks after he had given Maynard an examination. Dr. Cameron reported that Maynard had low back pain with a limitation of motion. He indicated that Maynard experienced occasional petite seizures that were controlled most of the time by medication. However, he also noted that the medication did not interfere with Maynard's daily activities or abilities. He further noted that he had never observed the seizures. Although he reported that Maynard could not walk on his heels and toes, Dr. Cameron indicated that Maynard did not need ambulation aids.
 
 
 11
 A consulting psychiatrist, Dr. Eugene Green, examined Maynard on October 23, 1982. Dr. Green diagnosed Maynard as having no significant clinically evident psychiatric disorder.
 
 
 12
 A consulting orthopedic surgeon, Dr. Frederick Elder, examined Maynard on November 4, 1982. At this time, Maynard's chief complaints were of pain in the lumbosacral area and headaches. Lumbosacral x-rays showed spina bifida occulta of S1 with no other abnormalities. Dr. Elder opined that Maynard's lumbar complaints were mechanical in nature and that there was no objective evidence of lumbar nerve root compression. Diagnosis was a probable lumbar sprain.
 
 
 13
 A consulting psychologist, Dr. Warren Bertner, examined Maynard on March 30, 1983, for an intelligence estimate. Testing with the Wechsler Adult Intelligence Scale resulted in findings of a verbal IQ of 66, a performance IQ of 60 and a full scale IQ of 61, thereby placing Maynard in the middle of the mildly retarded range. Dr. Bertner opined that the pattern of Maynard's subtests was consistent with a decrement in ability from a level which was previously higher and that he suspected that brain damage was a likely source of Maynard's difficulties.
 
 
 14
 Dr. Cameron provided a third report on April 4, 1983, after examining Maynard on March 31, 1983. This report essentially mirrors the report provided by him on January 21, 1981. As before, Dr. Cameron again noted a limitation of motion in the lumbosacral spine as well as hyperactive reflexes bilaterally. He opined that Maynard was permanently and totally disabled.
 
 
 15
 The final medical report contained in the record is a psychological report from Dr. John Showalter, a consulting psychologist, who examined Maynard subsequent to his hearing on May 9, 1983. Testing with the Wechsler Adult Intelligence Scale revealed a verbal IQ of 56, a performance IQ of 59 and a full scale IQ of 55 which placed Maynard in the mentally defective range of intellectual functioning, at the lower end of a mild level. Testing with the Bender-Gestalt test indicated rather severe organic pathology and a very low level of developmental maturity. Maynard's reading grade level was determined to be 5.2. Showalter diagnosed Maynard as suffering from a borderline schizophrenic condition, probably best characterized by a schizoaffective disorder with some paranoid flavorings. He opined that considering Maynard's psychological limitations, as well as his intellectual functioning, he would have a very difficult time maintaining any kind of gainful employment. He further noted that it was rather surprising that Maynard was able to function as a truck driver with his measured intelligence, and raised the possibility that Maynard either misrepresented his previous employment or simply obtained an IQ score somewhat lower than his "real" ability.
 
 
 16
 The ALJ issued his opinion on July 28, 1983. The ALJ found that Maynard had severe impairments best diagnosed as mental retardation and a schizoaffective disorder which were documented by the medical evidence as commencing on March 30, 1983. He also found that these impairments met the requirements of 20 C.F.R. pt. 404, subpt. P, app. 1, Sec. 12.05 C, and had precluded Maynard from working for at least 12 continuous months. Therefore, Maynard was found to be disabled as defined in the Social Security Act since March 30, 1983. Maynard argued to the Appeals Council for an award of benefits as of October 2, 1978; however, the Appeals Council denied his request to review the hearing decision. Therefore, the ALJ's decision became the final decision of the Secretary.
 
 
 17
 Maynard timely filed the instant action with the district court pursuant to 42 U.S.C. Sec. 405(g). On December 16, 1985, the district court affirmed the Secretary's decision. Maynard moved for reconsideration of this judgment. The district court determined that this motion lacked merit and denied it on February 19, 1986. This appeal followed.
 
 II.
 
 18
 Pursuant to 42 U.S.C. Sec. 405(g), the Secretary's findings are conclusive if supported by substantial evidence. For there to be substantial evidence there must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This court cannot base its decision entirely upon a single piece of evidence; the record must be evaluated as a whole. Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir.1978).
 
 
 19
 This deferential standard of review applies only to resolving issues of fact and credibility. Wiggins v. Schweiker, 679 F.2d 1387 (11th Cir.1982); Beavers v. Secretary, 577 F.2d 383, 387 (6th Cir.1978). Even if the reviewing court would resolve the factual issues differently, the Secretary's determination must stand if it is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058 (6th Cir.1983).
 
 
 20
 Maynard first argues that the Secretary erred in concluding that the record did not document a severe impairment prior to the psychological evaluation of Maynard performed on March 30, 1983. In support of this argument, he contends that the ALJ failed to properly consider his treating physician's reports regarding his disabling pain and syncopal attacks. In these reports, the treating physician opined that Maynard was permanently and totally disabled. In the alternative, Maynard argues that IQ results of his May 9, 1983 psychological report clearly meet a listed impairment addressing mental retardation. In support of this argument he contends that he could not have become mentally retarded "overnight." Although Maynard has set forth two separate issues, each essentially requires review solely on the question of substantiality of the evidence. Therefore, while we address each of Maynard's arguments, we will do so within the context of our substantial evidence inquiry.
 
 
 21
 Although Maynard argues that the ALJ failed to accord proper deference to the treating physician's reports, we believe that this argument is without merit. As a general rule, the medical opinions and diagnoses of treating physicians are accorded substantial deference, and, if uncontroverted, complete deference. King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984). However, this is true only if the treating physician's opinion is based upon sufficient medical data. Harris v. Heckler, 756 F.2d 431, 435 (1985). Ultimately, the determination of disability is the prerogative of the Secretary, not the treating physician. Id. In the instant case, Dr. Cameron, the treating physician, could not point to any objective evidence of nerve root involvement, muscle atrophy or sensory changes, even though he opined that Maynard was permanently disabled because of his back impairment. Moreover, there is medical evidence in the record indicating that Maynard did not suffer from lumbar root nerve compression. Additionally, although Dr. Cameron noted that Maynard suffered from syncopal attacks, there is no supportive medical evidence for this diagnosis in the record. Although one EEG was borderline abnormal, a repeat test was normal. Furthermore, no one has witnessed these attacks. Maynard's assertions that he suffers from syncopal attacks is the sole evidence offered. Since Maynard's complaints of back pain and syncopal attacks are not supported by the medical evidence, we believe the ALJ's finding that Maynard did not document a severe impairment prior to his psychological evaluation should be upheld.
 
 
 22
 As an alternative argument, Maynard contends that he clearly met a listed impairment under both Sec. 12.05B and Sec. 12.05C on October 2, 1978.
 
 Section 12.05C requires:
 
 23
 A valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function.
 
 
 24
 20 C.F.R. pt. 404, subpt. P, app. 1, Sec. 12.05C. In support of this argument he relies on his IQ test scores, which clearly fall into or below the required range, and his allegations of suffering from a back impairment since October 2, 1978, which imposed a significant work-related limitation of function. However, as discussed above, the objective medical evidence of record does not support the existence of such a physical impairment. Therefore, this argument lacks merit.
 
 Section 12.05B requires:
 
 25
 A valid verbal, performance or full scale IQ of 59 or less.
 
 
 26
 20 C.F.R. pt. 404, subpt. P, app. 1, Sec. 12.05B. In support of this argument Maynard relies specifically on his May, 1983 test results of a verbal IQ of 56, a performance IQ of 59 and a full scale IQ of 55, and argues that he could not have become retarded "overnight." However, IQ tests administered approximately three months prior to the May, 1983 tests, resulted in a verbal IQ of 66, a performance IQ of 60 and a full scale IQ of 61. Additionally, Dr. Showalter, the psychologist who administered the second series of IQ tests, noted that Maynard's past work experience as a truck driver, as well as his scores regarding his reading level, indicated a reduction in Maynard's intellectual functioning level. Furthermore, Dr. Showalter raised the possibility that Maynard may have obtained an IQ score somewhat lower than his "real" ability. In light of these factors, we find no merit in this argument.
 
 
 27
 Ultimately, the claimant has the burden of establishing that he became unable to engage in substantial gainful activity by reason of physical or mental impairments, the existence of which is demonstrated by medically acceptable clinical and laboratory diagnostic findings. Allen v. Califano, 613 F.2d 139 (6th Cir.1980). In the instant case, Maynard did not meet this burden until March 30, 1983. At that time he established a valid IQ score and the existence of a mental impairment, a schizoaffective disorder, which imposed an additional and significant work-related limitation of function, thereby placing him squarely within Sec. 12.05C. The record lacks substantial evidence of severe impairment prior to this date. In sum, the Secretary's determination that Maynard did not establish a disability for social security purposes until March 30, 1983 must be upheld.
 
 
 28
 Having concluded that substantial evidence supports the Secretary's determination of the onset date of Maynard's disability, we accordingly AFFIRM the judgment of the district court.