829 F.2d 39
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Arthur RICKS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 86-3769
 United States Court of Appeals, Sixth Circuit.
 September 18, 1987.
 
 Before MERRITT, BOYCE F. MARTIN, Jr. and WELLFORD, Circuit Judges.
 PER CURIAM.
 
 
 1
 Arthur Ricks has a high school education and two years of vocational training as a cement mason. This work at times involved the operation of heavy machinery and certain tools and was the only kind of work Ricks had performed. In May, 1981, at age thirty-six, Ricks fell into a hole and injured his back. He continued to work, but the pain worsened. At the initial hearing on his subsequent claim for disability benefits under the Social Security Act, Ricks testified that he has been unable to work since July 1981 because of back pain and pain and numbness in the right leg. He testified that when he tries to bend over he experiences a pulling sensation in the middle of his back and his right leg gives out. He also testified that 'prolonged' walking causes pain. He can sit for about one hour, stand in one position one-half hour, and then claims he would have to lie down or lean against a wall. He also testified to severe headaches and numbness in his right little finger. He drives approximately 20 hours per week since his injury.
 
 
 2
 Ricks was treated at Bethesda Hospital for back pain shortly after the fall. X-rays of the lumbar ('L-5') spine and pelvis were normal. He was given medication and diagnosed as having back strain, but in 'good' condition.
 
 
 3
 Dr. Ralph Watson saw Ricks twice in July 1981. On July 1 a physical examination of his back revealed mild to moderate right sacral tenderness to palpation. He had considerable discomfort on twisting or bending his back. Dr. Watson assessed lumbosacral muscular back strain, gave him medications, and prescribed bed rest on a firm mattress and a heating pad and aspirin for pain. On July 15, Ricks reported that he had been working despite the pain and that the pain was better but still present. An examination revealed mild lumbosacral tenderness and mild pain. A right sacral nodule was mildly tender. His reflexes were normal, and he was able to walk, but he had some pain in walking. Absent x-rays, EMG, or myelogram testing on Ricks, Dr. Watson's diagnosis was lumbosacral tenderness on the right with a history of pain radiating down the right posterior leg, possibly from lumbar nerve root compression.
 
 
 4
 Ricks was again later hospitalized at Bethesda during 1981 for complaints of pain in the lower back and right leg. A lumbar myelogram on November 3 showed a herniated disc on the right side. His physical examination indicated tenderness in the lumbosacral region of the spine and discomfort in the right sciatic area. A right straight leg raising test was positive. Extension of the back also produced some pain, and side movements and rotations were normal but slightly painful. The left leg raising test was normal. The sensations, motor power, and deep tendon jerks were equal and normal in both legs. A consulting physician, Dr. Hackworth, also found, in addition to the herniated disc diagnosis, hypertension which was 'moderately severe and definitely in need of medication to control.' Ricks was then put on antihypertensive medication. Surgery for the herniated disc was postponed pending a second opinion.
 
 
 5
 Dr. Pagani later reported that his examination of Ricks' back revealed a normal curvature without localized tenderness to pressure. Ricks was unable to bend down and touch his toes because of pain in his right back thigh. Extension and lateral bending revealed no restriction in his lumbar spine. His muscle strength was normal, and he demonstrated no sensory loss in the 'S1 and L5 dermatome.' Straight leg raising produced no pain on either side up to 60 degrees. He was able to walk on his heels and toes without difficulty. Dr. Pagani diagnosed a herniated disc and recommended surgery 'if he has not improved and needs to return to work as a mason.'
 
 
 6
 Dr. David Mattingly examined Ricks later as a consultant for the Ohio Bureau of Disability Determinations. He reported that Ricks complained of pain in the lower right back with radiation to the right back thigh and right foot area, with occasional numbness in the right toes. His pain increased with bending, lifting, prolonged sitting or standing, or coughing or laughing. On examination he ambulated normally and could bear weight fully on both legs. The range of motion in his lumbar spine revealed diminished forward flexion extension, lateral bending, and rotation. Range of motion in the knees and ankles was slightly diminished. Deep tendon reflexes were normal, and sensation in the lower extremities was normal. Muscle strength of the knee, ankle, and toe flexors was normal. Dr. Mattingly found no tenderness or spasm in the back, but the right leg raising test was positive. X-rays of the lumbosacral spine were found to be normal. The overall impression was probable herniated disc with right leg radiculopathy, but the level of disc herniation could not be determined. The Ohio Bureau of Workers' Compensation recommended physical therapy with hot packs, ultrasound, massage, and traction.
 
 
 7
 Dr. David Gillis, plaintiff's treating physician, submitted several reports. On November 28, 1982, he reported having first examined Ricks on July 21, 1982 and last having seen him on October 25, 1982. He observed that Ricks suffered pain in the lower back and had only 50-60 degrees flexion, extension, lateral bending, and rotation. His pain and problems had reportedly become progressively worse. Dr. Gillis diagnosed a herniated disc and recommended a lumbar laminectomy. He reported that Ricks needed a cane to walk, and he recommended medication and treatment. Dr. Gillis commented that Ricks was 'not able to go to work at this time--totally disabled for next twelve months.' After examining Ricks on December 7, 1982, however, Dr. Gillis reported to the Ohio Bureau of Workers' Compensation that Ricks' back condition had not changed and that normal recovery had been delayed. Dr. Gillis estimated that Ricks could resume 'light work' or 'regular work' on April 7, 1983.
 
 
 8
 In a letter to Ricks' attorney, dated May 9, 1983, Dr. Gillis described Ricks' medical history and the history of his back problems. He also described the results of Ricks' November 1981 examinations. Since that time Ricks complained that he experienced more and more pain in his back and legs. Ricks had been unable to resume work in the cement business, in Dr. Gillis' view, and was incapable of any lifting, bending, carrying, or stooping. Ricks' treatment had been conservative to date because he was afraid of surgery. This fear caused him anxiety and psychological problems, for which he was referred to a psychiatrist. Dr. Gillis reported that the potentiality of surgery had become more obvious. Dr. Gillis concluded: 'In his present condition he certainly is permanently totally disabled and of no real industrial value. He obviously will be in this status for the next 12 to 24 months as he has been this way for a similar number of months. He is not a candidate for any sedentary or ambulatory type of work.'
 
 
 9
 In a later 1983 medical assessment of Ricks' ability to work, Dr. Gillis reported that Ricks was capable of sitting for a maximum of one hour, standing for a maximum of 30 minutes, lifting 15-25 pounds, carrying 15-25 pounds for 30 minutes, walking 30 minutes, and bending, pushing, or pulling on a limited or infrequent basis. Ricks had no problems handling objects, seeing, hearing, or speaking.
 
 
 10
 A psychiatrist, Dr. Dorsey, reported in March of 1983 that Ricks suffered from mild anxiety and depression, primarily due to his back problems. The degree of disability from the mental problems was estimated at 10-15 percent of total 'personal functioning.' Dr. Dorsey also recommended office psychotherapy and antidepressant medication.
 
 
 11
 On August 18, 1983, Dr. Ronald Cantor from the Department of Disability reported on a Residual Functional Capacity Form that Ricks was capable of 'light work,' but not 'sedentary work,' because he found Ricks did not to suffer from any nonexertional limitations. Apparently, no clinical evidence accompanied this report, and the record contains no evidence of any examination supporting Dr. Cantor's conclusions.
 
 
 12
 At the request of the ALJ, the Cincinnati Evaluation Center also evaluated Ricks' condition. His physical capacities evaluation showed full range of motion and dexterity in the arms, hands, and fingers, and full movement in the spine and shoulders. He had pain in forward flexion, in extension, and in certain lateral movement. He pushed and pulled 30 pounds from a sitting position, lifted 20 pounds with his right hand, and carried 20 pounds for 30 feet, although he 'felt this' in his back. The report concluded from these tests that Ricks 'appears able to manage sedentary to light category employment, with the option to change positions as needed and with no frequent bending.'
 
 
 13
 During work sampling testing, Ricks was able to stand 20 minutes for an assembly task and able to complete tasks from a sitting position, although he stood during breaks for relief. His speed was slow, but he was highly accurate in sorting, classifying, and coordination. The report noted that he grimaced a great deal during the testing and at times he preferred to give up rather than complete the task. His I.Q. was in the low average range. Ricks was found to suffer from moderate depression and anxiety and seemed to have a greater than normal concern about his health; it was thought that he might have overemphasized his discomfort. The evaluators concluded that 'while Mr. Ricks appears capable of managing sedentary to light category work with no frequent bending and the option to change positions as needed, he does not demonstrate skills to qualify for the range of employment within these parameters.'
 
 
 14
 On November 20, 1983 Ricks was again admitted to the Bethesda Hospital emergency room for severe back pain, being transported by wheel chair and stretcher. He was treated with medication and apparently discharged. Finally there was a hospital admission during January of 1984. The diagnosis was chest pain, hypertension, alcoholic hepatitis, and chronic low back pain.
 
 
 15
 Ricks' vocational report reported that he used machines, tools, and equipment, including a trowelling machine. The job involved standing or walking, bending, reaching, and lifting and hauling heavy machinery.
 
 
 16
 A vocational expert, Dr. Livingston, interviewed Ricks on September 7, 1984 and reported his assessments in a letter to Ricks' attorney. The physical demands were classified as 'medium' by the Labor Department, but 'heavy' and 'skilled' according to the Social Security regulations. According to the Labor Department the skills and abilities most frequently associated with cement masonry include: (1) knowledge of tools, machines, materials and methods used in trade or craft specialty; (2) reading scale drawings or blue prints to visualize objects; (3) using shop math to calculate object dimensions, material amounts needed, and material costs; (4) coordinating eyes, hands, and fingers to use handtools or machines in constructing, making or repairing; and (5) adhering to object specifications or standards.
 
 
 17
 Dr. Livingston tested Ricks and found him to read at grade level 8.6 and his arithmetic skills to be at grade level 5.6. Dr. Livingston analyzed the results of the achievement test and determined that Ricks did not have the requisite skills to function in a full range of semi-skilled or skilled occupations. His 'transferability of skills is seriously compromised,' in Dr. Livingston's view.
 
 
 18
 Dr. Livingston also reviewed the medical evidence and the vocational evaluation from the Cincinnati Evaluation Center. Dr. Livingston concluded that Ricks had no transferable skills and must be considered unskilled. His physical limitations, including restricted range of motion, pain, and an inability to sit or stand for prolonged periods, also created a serious obstacle to unskilled work. Because of Ricks' vocational and physical limitations, Livingston determined that Ricks was 'totally occupationally disabled.'
 
 
 19
 Another vocational expert, Mr. Rosenthal, testified at a second hearing that Ricks' past work was heavy, skilled work. In this job Ricks 'acquired skills' including the ability to use tools, materials and methods in his trade specialty, the ability to use tools and machines, construction making or repairing, and the ability to adhere to objective standards and specifications. Rosenthal viewed these skills as transferable to less strenuous jobs such as inspection work, operating light machines, and a variety of semi-skilled assembly work. He testified that about 10,000 light assembly jobs and 2,000 sedentary assembly jobs were available in Ricks' geographic area. Available inspection jobs ranged from 3,000 in light category to 1,000 sedentary, and approximately 3,000 light machine operation jobs were available. These jobs are all defined as semi-skilled.
 
 
 20
 When asked if the jobs allow the employee to alternately sit and stand, Rosenthal responded that some of the assembly and inspection jobs do, but the light machine jobs do not. Rosenthal did not know any specific numbers or percentages of jobs that allowed alternate sitting and standing, but he mentioned four employers in the region who could provide such jobs. He estimated that 25 to 50 percent of the jobs would allow alternate sitting and standing. Addressing vocational adjustment, Rosenthal responded that some adjustment would be required because the industry setting, machinery, tools, work processes, and products would all be different. He said that a minimum of 30 days would be required to learn the jobs. Specifically concerning tools, Rosenthal responded that although the tools would be different, the skill acquired in using the cement mason's tools could be used in using other tools in another industry, with appropriate training. Based on the results of the Cincinnati Evaluation Center's evaluation, he was of the view, nevertheless, that a person with the characteristics described in Ricks' test results would not be able to perform the jobs he had listed as available in the region.
 
 
 21
 Ricks initially filed for benefits in September, 1982, alleging disability primarily due to back problems. The ALJ determined that Ricks was not disabled, concluding that although he was unable to perform his last relevant work, he had 'the residual functional capacity for the full range of sedentary work.' The Appeals Council remanded the case for further information 'as to whether there are sedentary jobs and light jobs which can be performed by an individual who must alternate sitting and standing and the evidence of such work in the region where the claimant lives or in several regions of the country.' The Appeals Council specifically directed:
 
 
 22
 The administrative law judge shall obtain testimony from a vocational expert as to whether or not the claimant acquired skills in his previous work exprerience that are readily transferable to a significant range of skilled or semi-skilled work within the claimant's residual functional capacity. The vocational expert shall be asked how much, if any, vocational adjustment would be required in terms of tools, work settings, work processes, or the industry.
 
 
 23
 Another ALJ took the case on remand and held a hearing, including testimony from a vocational expert. Based on the medical evidence and the hearing testimony, the ALJ determined that 'Mr. Ricks retains the residual functional capacity to engage in sedentary and light work not requiring prolonged standing or sitting' and that 'a significant number of semi-skilled and sedentary jobs of a sit/stand variety for inspectors and assemblers exist in his region that he can perform.' The Appeals Council affirmed the ALJ's conclusions on remand, finding 'No basis . . . for review.' A United States Magistrate recommended affirming the Secretary's decision, and the district court adopted his report and recommendation and entered an order affirming the Secretary's decision.
 
 
 24
 The medical evidence clearly indicates that Ricks' back condition prevents him from being able to perform his past relevant work, cement masonry.[1] The question in this case is whether Ricks retains the residual functional capacity to perform sedentary or light work. The ALJ found that Ricks could perform a substantial number of sedentary and light jobs. Two significant issues are raised in this appeal. One, does Ricks' inability to sit or stand for prolonged periods render him disabled for sedentary or light work? Two, does substantial evidence support a finding that Ricks has transferable skills?
 
 
 25
 We recently ruled that a person who is unable to sit or stand for prolonged periods of time, and who must alternate between sitting and standing, is not capable of performing sedentary work as defined in the regulations by the grid in the absence of vocational testimony. See Wages v. Secretary of HHS, 755 F.2d 495 (6th Cir. 1985).
 
 
 26
 A vocational expert testified that 25 to 50 percent of the 10,000 to 3,000 light assembly and inspection jobs available in the pertinent area would allow alternate sitting and standing. Addressing the results of Ricks' evaluation by the Cincinnati Evaluation Center, however, Mr. Rosenthal testified that a person possessing such characteristics would not be able to perform the listed jobs. Rosenthal seems to have based this conclusion primarily on the fact that Ricks is slow and methodical. The ALJ did not address this question fully in his opinion; he did not evaluate Rosenthal's testimony and the results from the Cincinnati Evaluation Center. Unlike Wages, however, substantial medical evidence in this case indicates that Ricks was not completely disabled at various times.
 
 
 27
 The evaluation from Cincinnati Evaluation Center concluded that Ricks would be capable of light work so long as he had the option to change positions as needed and did not have to bend frequently. The ALJ did fully address this apparent conflict in the vocational evidence concerning Ricks' capacity to perform light or sedentary work. Resolution of conflicts in the evidence of this kind should be a matter for the ALJ to decide in the first instance. See, e.g., Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983). On remand, the Secretary should address the question.
 
 
 28
 The second problem in this case is whether Ricks had transferable skills. He clearly had acquired skills from his work as a cement mason; the question is whether those skills were transferable to any light or sedentary jobs. The ALJ indicated, erroneously in our view, that the question of transferable skills is immaterial for a man of Ricks' age. The question of vocational adjustment is less of a concern for a claimant under age 45, but the regulations do not indicate that transferability of skills is immaterial for persons under 45. See C.F.R. Sec. 404, Subpart P, Appendix 2. Ricks, moreover, was 45 at the time of the hearing. We have held that absent evidence that a claimant has 'particularly transferable skills,' the Secretary has not met the burden of proving the claimant can engage in substantial gainful employment. See, e.g., Richardson v. Secretary of HHS, 735 F.2d 962, 964 (6th Cir. 1981). The ALJ did state a conclusion that Ricks had skills that were transferable to light and sedentary jobs without further explanation.
 
 
 29
 We are troubled by the conclusion of transferable skills without adequate consideration of the analysis of skills versus aptitudes. See Ellington v. Secretary of HHS, 738 F.2d 159, 161 (6th Cir. 1984).
 
 
 30
 In light of all the circumstances and the difficulties discussed, we REMAND this case to the ALJ for further consideration and amplification.
 
 
 
 [1]
 An interesting question is whether surgery could rectify Ricks' problem, and to what extent. The record indicates that several doctors recommended surgery, but postponed it in favor of more conservative treatment because of Ricks' fears. The record does not clearly establish the likelihood of success or risks involved