816 F.2d 679
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
William R. CORSON, Plaintiff-Appellant,
v.
Otis R. BOWEN, Secretary, Department of Health and Human
Services, Defendant- Appellee.
 No. 86-3124.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1987.
 
 Before LIVELY, Chief Judge, and WEICK and CONTIE, Senior Circuit Judges.
 PER CURIAM.
 
 
 1
 William R. Corson appeals from the judgment of the district court affirming the Secretary's denial of social security benefits. For the reasons that follow, we affirm.
 
 I.
 
 2
 Corson filed an application for disability insurance benefits on May 29, 1979, claiming inability to work as of August 25, 1978, due to "back surgeryone disc removed and fusion performed with hip problem." This application was denied initially, and upon reconsideration. Corson then requested and was given an administrative hearing on January 21, 1980, before an Administrative Law Judge (ALJ). The ALJ issued a decision on May 10, 1980, denying Corson's application. In this decision the ALJ found that Corson had the residual functional capacity to perform sedentary work and that when Corson's vocational factors were considered with this residual functional capacity, Rule 201.28 of Appendix 2, Subpart P of 20 C.F.R. Sec. 404 directed a conclusion of not disabled. Corson requested review of this decision by the Appeals Council. This request was denied on June 18, 1980. Corson then timely filed an action with the district court. By agreement of both parties, the U.S. Magistrate was given authority to decide the case. On May 14, 1981, the Magistrate remanded the proceeding to the Secretary on the basis that the grids, as applied, were inconsistent with decisional law controlling in the Sixth Circuit. However, since that time the validity of the grids in general was upheld by the Sixth Circuit in Kirk v. Secretary of Health and Human Services, 667 F.2d 524 (6th Cir. 1981), and by the Supreme Court in Heckler v. Campbell, 461 U.S. 458 (1983), albeit with cautions as to overly broad application.
 
 
 3
 On January 16, 1984, the Appeals Council remanded the case to the ALJ for further proceedings consistent with the order of the district court. A second hearing was held on May 24, 1984. Corson was represented by counsel at this hearing. During this hearing Corson's counsel reported that Corson had begun working as a truck driver in March, 1981, and had been involved in an accident in October, 1981. Counsel also stated that this accident had aggrevated Corson's prior physical impairments. Corson had not worked since that time. Consequently, the ALJ considered Corson's claim from the perspective of two distinct time periods, the first being from the alleged disability onset date to March, 1981, and the second being from October, 1981, forward.
 
 
 4
 Corson testified at each hearing as to his personal history, his work history and his ailments. Corson was born on March 17, 1942. He has a twelfth grade education. He last worked in October, 1981, as a truck driver. His prior work experience includes working as a dairy farmer and owning and operating a floor covering business.
 
 
 5
 Corson testified to the following at the first hearing. He stated that he first started having trouble with his back in August, 1978. He experienced pain which began in his back and traveled down his right leg. He was placed in traction and received physical therapy for this pain in October, 1978. In December, 1978, he underwent back surgery. He testified that after this surgery his leg pain subsided; however, he still experienced severe back muscle spasms. He stated that he was able to walk for only 15 minutes and sit for 45 minutes before experiencing these spasms. His medication prevented him from driving a car. He further stated that his daily activities were limited to helping with housework, exercising, walking and reading. Since his back surgery, he also started to have problems in the area between his shoulders. He stated that he expected to have surgery for this problem sometime in the future.
 
 
 6
 At his second hearing, Corson testified that he was only able to walk 500 feet before experiencing spinal headaches. He had no problems standing and was more comfortable sitting than laying down. He stated that he wears a sling and is unable to use his left arm because of pain in the left socket. He further testified that he spends close to 20 hours a day sleeping or trying to sleep and that he was awake more at night than during the day. He usually takes aspirin and prescribed medications daily, depending on how his condition is and how much he takes. During a one week period, he stated that he may experience three good days. Since his October, 1981 accident, he has experienced headaches at least once each day. He always experiences some pain.
 
 
 7
 The following medical evidence is contained in the record. Corson was admitted to Greenville Hospital on October 15, 1978, complaining of right leg pain with no history of apparent injury. He was noted as being in obvious discomfort with limited back motion and difficulty in going from a supine to a sitting position. X-rays of the lumbosacral spine showed narrowing of the lumbosacral interspace and hypertrophic spurring. X-rays of the lumbar spine showed associated hypertrophic spurring, narrowing of the 7th, 8th and 9th thoracic interspaces and a slight deformity of the anterior aspect of the body of T-8 secondary to trauma. Corson received conservative care, including pelvic traction and was discharged to his own care on October 18, 1978, with a final diagnosis of acute lumbosacral sprain
 
 
 8
 Corson was readmitted to Greenville Hospital on November 30, 1978, complaining of right leg pain. An epidural venogram showed findings at the L5-Sl level on the right side that were consistent with the impression of a herniated disc. Corson underwent an excision of a herniated disc at L5 on the right with spinal fusion laterally from L5 to Sl. He was discharged on December 19, 1978,with a final diagnosis of herniated nucleus pulposus at L5 on the right.
 
 
 9
 On June 20, 1979, Dr. R. H. Baker, Corson's then treating physician, reported that Corson had complaints of back and right leg pain. However, he described Corson's gait as good and noted that there was no need for ambulation aids. In a summary of a report taken by telephone on September 14, 1979, Dr. Baker's secretary reported that Corson was last seen in August and that he continued to have back pain which worsened on prolonged standing. There had been no change in Corson's neurological status since June 15, 1979, and the chart did not note any complications.
 
 
 10
 In June of 1979, Corson's care was taken over by Dr. John F. Steele. At that time, Corson complained of an upset stomach and pain between his shoulders. Dr Steele made a provisional diagnosis of cervical strain of the neck. He recommended an exercise program for Corson's neck and aspirin for the pain. X-rays and a follow-up exam in August, 1979, revealed the presence of degenerative disc disease of the cervical spine at C6-7. In October, 1979, Corson was struck in the face. This occurrence exacerbated his neck pain and he was hospitalized as a result from November 9, 1979, to November 14, 1979. Corson was treated conservatively and seemed to improve.
 
 
 11
 On January 11, 1980, Dr. Steele reported that Corson was still complaining of severe back pain and neck pain radiating down between the shoulders. Dr. Steele noted that examination showed marked decreased range of motion of the neck with restrictions of extension. Corson's back showed restricted straight leg raising, and muscle spasms with decreased range of motion. Dr. Steele's impression was that Corson was completely disabled due to chronic cervical sprain and chronic lumbosacral strain status post laminectomy and lumbar fusion. He opined that Corson's prognosis was poor for returning to work that would required heavy lifting, frequent bending or stooping. He recommended restricting Corson's lifting to less than 35 pounds and not lifting more than seven times an hour. He further recommended that Corson not have a Job that required prolonged standing for over one to two hours at a time.
 
 
 12
 In a letter dated February 7, 1980, Dr. Steele referred to the work restrictions he had set forth on January 11, 1980, and he indicated that he had intended to state that those restrictions would be applicable once Corson had sufficiently recovered to return to some type of work. Dr. Steele opined that Corson was unable to engage in any substantial gainful activity at that time.
 
 
 13
 On March 18, 1980, Corson underwent a consultative orthopedic examination. Dr. Edward Bauman, the examining orthopedist, diagnosed osteoarthritis of the cervical and lumbar spine, moderately severe; post-laminectomy and spinal fusion with right sciatica; and encroachment of neural foramina of C5, 6, secondary to osteoarthritis. Lumbosacral x-rays revealed moderate degenerative osteoarthritis. Dr. Bauman opined that although Corson should not be expected to do all of his farm work, he could do a moderate amount of work. However, he noted that squatting, lifting and twisting had been and would be increasingly difficult for Corson. In the physical capacities evaluation, Dr. Bauman indicated that Corson was able to sit or stand up to eight hours each in an eight hour day and could walk up to six hours in an eight hour day. He felt that Corson could lift or carry up to 10 pounds continuously and frequently lift or carry 20 pounds. He noted that Corson could use both hands and feet for repetitive movements; however, he felt that Corson should be limited to performing only occasional bending, climbing and reaching above shoulder level.
 
 
 14
 On June 30, 1980, Corson was readmitted to the hospital for elective surgery as a result of his continuous neck pain. He underwent cervical and lumbar myelogram studies which revealed no convincing evidence of a herniated disc in the cervical or lumbar regions. Nevertheless, on July 3, 1980, Corson underwent an anterior cervical spinal fusion of C6-7 with a bone graft from the left iliac crest. His post-operative course was noted as essentially unremarkable without complications. He improved and was discharged on July 11, 1980,with a final diagnosis of degenerative disc disease at C6-7.
 
 
 15
 In a sworn deposition prepared in conjunction with litigation irrelevant to the instant appeal, Dr. Steele stated that Corson's post-operative follow-ups led him to believe that Corson was improving and doing quite well. In March, 1981, Corson had good motion of his neck; however, he still complained of pain between his shoulders. In July, 1981, he still had some stiffness of the neck and pain between the shoulders. However, a progression of post-surgical x-rays revealed that the graft was in good position and healing satisfactorily. A November 2, 1981 x-ray revealed that a small traction spur was possibly starting at C5-6.
 
 
 16
 On October 30, 1981, Corson received emergency room treatment after being injured at work.[1] He stated that he had been struck by a barrel on his chest and he complained of pain in the cervical spine area radiating down his back and of a lump in his throat and shoulders. The emergency room impression was cervical strain. Corson was discharged in satisfactory condition with permission to return to work the following day.
 
 
 17
 Dr. Steele continued to treat Corson for complaints of pain involving both his shoulders and his neck. Because of the continued pain and lack of response to treatment, Corson was rehospitalized with a diagnosis of impingement syndrome and surgery was performed on his right shoulder on June 22, 1982. This surgery consisted of an arthrotomy of the right shoulder, a Neer acromioplasty and a Hitchcock procedure. Corson was discharged on June 27, 1982,with no complications. In deposition testimony, Dr. Steele indicated that in December, 1982, Corson's right shoulder was feeling good, but that Corson was still complaining of neck pain and left shoulder pain. He further stated that he recommended surgery on the neck and left shoulder.
 
 
 18
 On September 10, 1983, Corson was admitted to Greenville Hospital for conservative care after complaining of low back pain with left leg radiation. This pain began after he twisted while picking up a chain the day before. His physical exam was essentially normal except for positive straight leg raising at 25-30 degrees bilaterally. X-rays revealed hypertrophic spurring with droplets of opaque media in the subarachnoid canal. After being treated with a caudal block, physical therapy, heat and massage, Corson was discharged on October 14, 1983. His discharge medication was Tylenol 2 as needed for pain. The final diagnosis was "acute back."
 
 
 19
 Subsequent to his second hearing, Corson underwent the following three consultative exams at the request of the ALJ.
 
 
 20
 On June 26, 1984, Dr. Wolfgang Froelich, a consulting physician, saw Corson for psychiatric and neurologic evaluations. Dr. Froelich reported that Corson was alert, oriented and cooperative and displayed appropriate grooming. Corson's facial expression was appropriate and he did not avoid eye contact. There were no signs in expression, posture or psychomotor activity that would support his statements of being depressed. There was no unusual thinking, no unusual preoccupations and his memory functions were adequate. Dr. Froelich opined that he estimated Corson to be of average intellectual endowment. On neurological exam Corson's gait was antalgic, but essentially nonspecific. No ambulatory aids were used. Corson entered the consultation room with his left arm in a sling and avoided all movements of this arm and hand. He kept his left shoulder immobilized when the sling was removed and would not move it during the exam. Neck mobility was limited to 30 degrees turning to the right, 45 degrees turning to the left, 20 degrees flexion and 10 degrees extension. Low back mobility was to 45 degrees flexion, 20 degrees lateral flexion to either side and 10 degrees extension. There was complete loss of lumbar lordosis and there was tightness of the paraspinal muscles in the lumbar region. Grip strength on the right was 80 pounds and zero to ten pounds on the left after much encouragement and coaxing. There was no atrophy of any of the muscles in the upper or lower extremities, or of the small hand muscles. Dr. Froelich's impression was that Corson apparently had intense left shoulder pain of an unknown cause. He further noted that there was some discrepancy between the intensity of Corson's complaints pertaining to the left shoulder and the left arm and the lack of objective findings; muscle tone and bulk were the same in both upper extremities. Furthermore, Dr. Froelich indicated that Corson's symptoms were not due to conversion phenomena.
 
 
 21
 On June 27, 1984, Corson underwent a consultative orthopedic exam performed by Dr. Robert Rochelle. On examination Corson had a normal gait and station; however, he had his left arm in a sling and refused to move his arms or shoulders. He would not attempt to make any left arm motions complaining of pain. He was tender over the left biceptal groove and had tenderness over the acromioclavicular joints, but had no deformity of the shoulders. No rotator cup defect was palpable. Deep tendon reflexes were present and equal in the upper extremities. There was no deformity of the cervical spine, but there was some trapezius spasm. Grip in the right hand was 70 pounds and in the left hand was zero. When seated he could extend his legs to about 80 degrees. No sensory deficit was demonstrable in the lower legs. Right and left calves and thighs were of comparable measurements. There was a marked loss of the normal lumbar lordosis and a very marked paravertebral lumbar muscle spasm. Heel and toe ambulation was carried on without mechanical difficulty and without eliciting any pain in the back. X-rays of Corson's lumbosacral spine were interpreted as indicating advanced degenerative disc disease at L5-Sl. Dr. Rochelle's diagnosis was status post-operative herniated disc with spinal fusion.
 
 
 22
 On September 12, 1984, Corson underwent a psychological evaluation performed by Donald Degli, a consultative psychologist At the time of the examination Corson's orientation was reported as being generally adequate. His memory was unimpaired and he was alert. His concentration and thought was felt to be mildly impaired as he appeared somewhat occupied, mildly depressed and mildly anxious. Corson did not present himself as intellectually impaired. Mr. Degli indicated that Corson's personality and emotional assessment revealed an individual who was mostly preoccupied because of his many physical difficulties. The diagnostic impression was that of a dysthymic disorder. Mr. Degli noted that Corson was capable of following instructions, psychologically capable of doing routine or simple tasks even for lengthy periods of time, and could interact appropriately perhaps with some mild to moderate impairment due to his self-consciousness and tendency to withdraw from any intense interpersonal interaction.
 
 
 23
 The ALJ issued his opinion on December 12, 1984. The ALJ found that although Corson suffered from physical impairments, he did not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Sec. 404, subpt. P, app. 1. Accounting for recuperative and recovery periods, the ALJ concluded that the medical evidence failed to establish that Corson was under a disability or unable to perform sedentary work for any continuous period of at least 12 months any time from August 25, 1978 through the date of his decision. He further found that Corson's allegations concerning the severity of his symptoms and limitations as to preclude the performance of substantial gainful activity were not supported by the medical evidence and were not credible. Finding that Corson retained the residual physical capacity for sedentary work and considering his age, education and work experience, the ALJ applied the medicalvocational guidelines and concluded that Corson was not disabled pursuant to 20 C.F.R. pt. 404, subpt. P, app. 2, Table No. 1, Rules 201.28 and 201.29.
 
 
 24
 Corson timely filed the instant action with the district court pursuant to 42 U.S.C. Sec. 405(g). The Magistrate issued his Memorandum Opinion and Order on January 22, 1986, granting judgment to the Secretary, thereby affirming the Secretary's decision to deny benefits. This appeal followed.
 
 
 25
 II .
 
 
 26
 Pursuant to 42 U.S.C. Sec. 405(g), the Secretary's findings are conclusive if supported by substantial evidence. For there to be substantial evidence there must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This court cannot base its decision entirely upon a single piece of evidence; the record must be evaluated as a whole. Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).
 
 
 27
 This deferential standard of review applies only to resolving issues of fact and credibility. Wiggins v. Schweiker, 679 F.2d 1387 (11th Cir. 1982); Beavers v. Secretary, 577 F.2d 383, 387 (6th Cir. 1978). Even if the reviewing court would resolve the factual issues differently, the Secretary's determination must stand if it is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058 (6th Cir. 1983).
 
 
 28
 Corson first argues that his failure to follow a prescribed course of treatment due to his inability to pay for medical expenses is not a sufficient reason to deny his application for disability benefits. Corson presents this argument because the Magistrate, after first finding substantial evidence to affirm the Secretary's decision, suggested that this failure could have been an alternative basis for the denial of Corson's application although it was not one relied upon by the ALJ. Although Corson has gone to great lengths in support of this argument, this issue is not subject to review by this Court under these circumstances. Our review of social security cases "is to be governed by the substantial evidence standard in terms of the Secretary's final decision as expressed by the final action of the Appeals Council" after considering the record as a whole. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Therefore, although the Magistrate may have offered an alternative resolution, our review is constrained to the basis for the Secretary's decision as adopted by the Appeals Council. Accordingly, this argument will not be addressed.
 
 
 29
 Corson alternatively argues that the Secretary erred in finding that Corson was capable of performing sedentary work. In support of this argument Corson relies on the medical records and his complaints of pain contending that the denial of benefits was based more upon suspicion and speculation rather than upon objective medical evidence.
 
 
 30
 Sedentary work is defined in the regulations as follows:
 
 
 31
 Sedantary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
 
 
 32
 20 C.F.R. Sec. 404.1567(a). Although there were times during which Corson could not perform sedentary work, specifically the time periods surrounding his operations, we believe that the Secretary was correct in finding that the record does not support a conclusion that Corson has been incapable of such work for at least 12 continuous months.[2] Dr. Baker, Corson's original surgeon, reported that after his first surgery Corson was recovering satisfactorily. There was no finding of incapacitating pain. When Dr. Steele began seeing Corson in 1979 for complaints of cervical pain only exercise and aspirin were recommended. Such treatment does not indicate disabling pain. It was not until late 1979, after Corson's condition was exacerbated when he was struck in the face, that Corson's complaints of cervical pain were severe enough to warrant hospitalization. Even at this time, the treatment was limited to conservative measures without any prescribed pain medications. Moreover, in March, 1980, Dr. Bauman, the consulting orthopedist opined that Corson was able to do moderate work with some restrictions.
 
 
 33
 In July, 1980, Corson underwent an anterior cervical spinal fusion even though his myelogram studies were negative. Dr. Steele performed this surgery and during all of Corson's post-operative follow-ups Dr. Steele found Corson to be improving and doing quite well. Once again, the record lacks evidence of a level of pain, requiring medication. Moreover, Corson returned to work in 11arch, 1981, less than 12 months after this surgery, even though he had complained to Dr. Steele of pain during that month.
 
 
 34
 In October, 1981, Corson was involved in a work accident, which, according to Corson's testimony at his second hearing, prevented him from returning to work. Reviewing the record from this point forward, we believe that Corson's complaints of disabling pain are not supported by the medical evidence. Although Corson underwent surgery on his right shoulder in June, 1982, his post-operative treatment was limited to exercising and taking anti-inflammatory medication. Furthermore, in deposition testimony on December 7, 1982, Dr. Steele stated that Corson's "degree of disability is what he could do that wouldn't be uncomfortable." Dr. Steele further stated that Corson had discomfort but that he felt that whatever Corson felt up to, he could actually perform.
 
 
 35
 Corson received no further medical treatment until September 10, 1983, at which time he entered the hospital complaining of low back pain. At this time he reported that he had been experiencing occasional pain which he relieved by rest and hot soaks. He had been taking no daily medications and did not complain of cervical pain. This evidence surely falls short of supporting Corson's complaints of disabling pain. Moreover, the consulting neurologist specifically noted a discrepancy between the intensity of Corson's complaints and the lack of supportive objective findings. Although pain alone may support a claim of disability, King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984), there must be a reasonable foundation in the medical evidence for the claimant's subjective complaints. See, Duncan v. Secretary of Health and Human Services, 801 F.2d 847 (6th Cir. 1986).
 
 
 36
 In sum, we find substantial evidence to support the Secretary's findings that Corson's complaints of disabling pain were not credible and that he was capable of at least sedentary work.
 
 
 37
 Having concluded that substantial evidence supports the Secretary's decision to deny disability benefits to Corson, we accordingly AFFIRM the judgment of the district court.
 
 
 
 [1]
 As previously noted, Corson began working as a truck driver in March, 1981, approximately two years subsequent to filing an application for disability benefits
 
 
 [2]
 Although Corson argues in his brief that he has been totally disabled over the entire duration of this matter, this argument lacks merit in light of the fact that Corson was employed as a truck driver from March, 1981 to October, 1981. Pursuant to 20 C.F.R. Sec. 404.1520(b), if a claimant is engaged in substantial gainful employment he will be found not disabled regardless of his medical condition or his age, education and work experience