848 F.2d 188
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Helen ADAMS, Plaintiff-Appellant,
v.
Otis R. BOWEN, M.D., Secretary of Health and Human Services,
Defendant-Appellee.
 No. 87-1057.
 United States Court of Appeals, Sixth Circuit.
 June 6, 1988.
 
 1
 Before MILBURN and BOGGS, Circuit Judges, and ANN ALDRICH, District Judge.*
 
 
 2
 Claimant Helen Adams appeals from a district court order affirming the Secretary's determination that she was not disabled and, therefore, not entitled to disability insurance benefits. For the following reasons, we reverse and remand for an award of benefits.
 
 
 3
 * Adams worked as a nurse's aide beginning in 1968. At the time of her disability in 1979, she had worked as both a nurse's aide and as a physical therapy aide. Adams first filed an application for disability benefits on August 13, 1979, alleging that she had become disabled on July 16, 1979. The Secretary granted her claim on November 24, 1980.
 
 
 4
 On October 20, 1982, the Secretary notified Adams that she had reviewed the file, and had decided that Adams was no longer eligible for benefits. Although there was no question that Adams could not perform her past relevant work, the Secretary determined that she was capable of doing sedentary work. Adams requested a hearing before an administrative law judge (ALJ). On July 29, 1983, the ALJ affirmed the Secretary's decision and held that Adams disability ceased in October 1982, and that her entitlement to benefits ended on December 31, 1982. On September 19, 1983, the Appeals Council denied Adams' request to review the termination of benefits.
 
 
 5
 Adams did not seek judicial review of her termination of benefits. Instead, on November 7, 1983, she filed a new application for disability benefits. The Secretary denied Adams' request for benefits, initially and on reconsideration. Adams requested a hearing before an ALJ, which was held on November 6, 1984.
 
 
 6
 At that time, Adams testified that she was 48 years old. She had an eleventh grade education, and last worked in 1979 as a nurse's aide; she had also previously worked as a physical therapy aide. The vocational expert later testified that these jobs are unskilled and require medium to heavy exertion. Adams complained that she suffered from chest pains, shortness of breath, dizziness and headaches, and that the chest pains usually made her feel nauseous. She testified that she could walk only one half-block before having chest pain and shortness of breath; could stand for only ten minutes before becoming dizzy and weak; could sit for only twenty minutes before having chest pain and dizziness; and could lift no more than approximately five pounds.
 
 
 7
 Adams also testified that once a week she drove to visit her mother-in-law, who lives three miles away. She used to quilt, but had to stop because it hurt her arms. Adams testified that she could take care of her personal needs, although she found it tiring. Her doctor had advised her to do no housework, and she did none. Adams had a normal appetite, but was unable to sleep well because of cramps.
 
 
 8
 Adams described her chest pains as a "tightness" in her chest. She testified that it sometimes occurred from strenuous activity, and sometimes for no apparent reason. Adams said that she took nitroglycerin approximately twice a day to relieve the pain, and that the nitroglycerin took effect in approximately three minutes.
 
 
 9
 After Adams had first received disability benefits for a period, she attempted to return to her past work. Her job lasted approximately eight days, before she became too tired to continue.
 
 
 10
 Adams was first diagnosed as having hypertension, mitral regurgitation, and atypical chest pain in August 1979 by her treating physician, Dr. Asher Buxbaum, a cardiologist. In September 1982, Dr. Buxbaum reaffirmed that Adams' chest pains were atypical, and that her hypertension required multiple medications to control. Adams' blood pressure at this examination was 156/99.
 
 
 11
 Dr. Buxbaum saw Adams again on March 17, 1983, at which time her blood pressure was 160/98. He increased the dosage of Inderal she had been taking.
 
 
 12
 On September 1, 1983 Adams saw Dr. Buxbaum and complained of increased dizziness and shortness of breath. She continued to use nitroglycerin to control her chest pain, and Dr. Buxbaum added Isordil to the three drugs she was already taking-Inderal, Apresazide and Midamor. He advised her to not return to work as a nurse's aide, and "because of her multiple medical problems," expressed the opinion that it was doubtful whether she could safely perform any full-time job.
 
 
 13
 On November 17, 1983, Dr. Buxbaum reported to the Secretary that Adams suffered chest pains both while exerting herself and at rest; that the pains occurred approximately twice daily; that they lasted anywhere from a few minutes to an hour; and that they were relieved by nitroglycerin. Dr. Buxbaum suspected that the pains were of cardiac origin. He reported that each time she returned to work, her blood pressure went out of control despite large doses of medication; and that even though the recently prescribed Isordil relieved her chest pains, she still had worsening symptoms of chest pain, palpitations, shortness of breath and frequent headaches.
 
 
 14
 At the request of Dr. Buxbaum, Adams was also seen by Dr. Aida Bodour, a neurologist, beginning in 1980. In January 1983, Adams returned to Dr. Bodour, complaining that she had increased dizziness and numbness in her left arm, and limited movement in her neck and left shoulder.
 
 
 15
 In July 1983, Adams complained to Dr. Bodour that while she had improved after taking the medications Dr. Bodour prescribed, she still had occasional numbness and tingling in her left arm. Dr. Bodour could find nothing significant, other than some pain upon stretching the triceps. However, she did recommend that Adams continue taking her previously prescribed medication, and increase the regimen of physical therapy and exercises. Dr. Bodour reported to the Secretary in December 1983 that she had performed no tests on Adams' range of motion, and suggested that she be examined again for a disability evaluation if that was an important factor.
 
 
 16
 At the request of the Secretary, Adams was examined by Dr. Imdad Butt on February 1, 1984. Adams had blood pressure readings of 170/100 and 160/88. Adams complained of having chest pains approximately ten times per week, with associated shortness of breath, palpitations, diaphoresis, and nausea. In addition, she complained of severe migraine headaches with associated vomiting, and a paralysis on the left side of her body, attacks which occurred approximately once a month. Dr. Butt found a subjective weakness of the left upper extremity.
 
 
 17
 Dr. Butt also took and reported to the Secretary Adams' family history. Both of Adams' parents have diabetes mellitus. One sister is diabetic. Her father had a myocardial infarction. One sister had hypertension and died at the age of 39. Another sister, then 32, had already had two strokes. Her mother had a stroke at the age of 50.
 
 
 18
 Dr. Butt concluded that despite receiving the appropriate anti-anginal medication, Adams suffered from unstable angina, as well as coronary artery disease. Dr. Butt also concluded that she suffered from hypertension, and had a history of chronic cholecystitis and migraine headaches. Dr. Butt reported that Adams had taken a stress test, but tired and had developed chest pains after only one or two minutes, at which time the test was terminated. Dr. Butt concluded that given her age and her family history, Adams should be subjected to a cardiac catheterization for evaluation and management.
 
 
 19
 Again at the request of the Secretary, Adams was examined by Dr. William A. Martin, on April 3, 1984. Adams' blood pressure was 180/110. Adams again described her chest pains and, in Dr. Martin's words, "the associated symptoms of sweats, nausea and dyspnea." Adams' heart had a normal sinus rhythm, but Dr. Martin did discover a grade II/VI systolic murmur. A resting EKG showed abnormalities described as non-specific ST changes. Dr. Martin did not perform a treadmill test because of the previous diagnoses of severe hypertension and unstable angina pectoris. Dr. Martin concluded that Adams had arteriosclerotic heart disease, manifested by angina pectoris, and poorly controlled accelerated hypertension.
 
 
 20
 The ALJ concluded that there was no recent medical evidence to support a severe impairment of Adams' cervical spine or left upper extremity. He found that Adams did suffer from hypertension that was difficult to control, but found no evidence to suggest that she has suffered any serious end organ damage or damage to her heart. While the ALJ accepted the non-treating physicians' findings of angina, he also discounted them because of the dearth of other abnormalities. The ALJ also found that Dr. Buxbaum's conclusions of disability were based solely on Adams' recent increase in blood pressure.
 
 
 21
 The ALJ did not discredit Adams' testimony per se. He did conclude that insofar as it was inconsistent with his other findings, her testimony had to be rejected. He found that the medical evidence did not evince impairments substantial enough to be reasonably expected to result in the limitations to which Adams testified. In particular, he relied on Adams' assertions that she was able to drive three miles, that she could take care of her personal needs, and that her appetite was normal. He also noted that Adams displayed no discomfort at the hearing.
 
 
 22
 James Engelkes, a vocational expert, testified at the hearing. In response to a question by the ALJ, Engelkes testified that assuming Adams had the capacity to perform sedentary work, but that she could not use her left arm for repetitive or overhead movement, there were 12,000 unskilled jobs in the lower peninsula of Michigan that Adams could perform. Engelkes also testified that if Adams' testimony regarding having to rest for twenty minutes out of every hour were to be believed, Adams would be precluded from the jobs he described.
 
 
 23
 The ALJ concluded that Adams' heart impairments were significant enough to prevent her from performing her past relevant work as a nurse's aide, because she would be unable to lift heavy objects or perform strenuous activities. He also concluded, however, that Adams could perform sedentary work. The ALJ ultimately found that while Adams had a severe cardiac impairment which might prevent her from performing strenuous activities, she had the residual functional capacity to perform sedentary work. He therefore concluded that based on her age and education, Adams was not disabled.
 
 
 24
 Adams appealed the decision to the Appeals Council, which denied review of the ALJ's opinion. Adams then filed this suit in federal court challenging the finding of no disability. The case was referred to a magistrate, who, on September 24, 1986, concluded that the Secretary's determination was not supported by substantial evidence. She found that Adams had met her burden of establishing the underlying medical basis for her pain, and recommended that the Secretary's decision be reversed. On December 10, 1986, the district court, without discussing the magistrate's recommendation, determined that there was substantial evidence to support the Secretary's determination, and upheld the rejection of benefits. This appeal followed.
 
 II
 
 25
 Pursuant to 42 U.S.C. Sec. 405(g), the Secretary's findings are conclusive if supported by substantial evidence. For there to be substantial evidence there must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This court cannot base its decision entirely upon a single piece of evidence; the record must be evaluated as a whole. Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir.1978).
 
 
 26
 This deferential standard of review applies only to resolving issues of fact and credibility. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir.1982); Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir.1978). Even if the reviewing court would resolve the factual issues differently, the Secretary's determination must stand if it is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058 (6th Cir.1983) (per curiam).
 
 
 27
 We first find that the ALJ incorrectly rejected Dr. Buxbaum's finding that it was unsafe for Adams to perform any work. It is clear that this determination by her treating physician was made not solely on the increase in her already elevated blood pressure since her last visit, but was a conclusion drawn from the totality of Adams' symptoms and ailments over a long period of time. There will often be some one event which causes a treating physician to recommend that an individual patient no longer continue to work. It is not that one event which the doctor then relies upon, but rather the totality of all of the patient's ailments and limitations. To dismiss Dr. Buxbaum's recommendation out of hand because the only difference in Adams' health that he noted was the increase in blood pressure was error.
 
 
 28
 We also agree with the magistrate that Adams met her burden of proving that she suffered from the pain she complained of. In Duncan v. Secretary of HHS, 801 F.2d 847 (6th Cir.1986), the Court held that we would review claimant's allegations of pain under Congress' temporary statutory standard, presently codified at 42 U.S.C. Sec. 423(d)(5)(A). "There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain." Id. at 853 (quoting S.Rep. No. 466, 98th Cong., 2d Sess. 24, reprinted in 130 Cong.Rec. 56221 (daily ed. May 22, 1984)).
 
 
 29
 Dr. Buxbaum, Adams' treating physician, as well as Drs. Martin and Butt, the physicians the Secretary referred Adams to, all concluded that Adams suffered from arteriosclerotic heart disease, manifested by unstable angina and accelerated hypertension. They also all accepted Adams' complaints of shortness of breath, or dyspnea. As noted above, Dr. Martin found this to be an associated symptom of her chest pains. We find that there was more than ample medical evidence to support Adams' complaints of fatigue and inability to do any activity without resting for ten or twenty minutes each hour.
 
 
 30
 The ALJ seems to have rejected this conclusion based on Adams' own testimony. The ALJ put great emphasis on the fact that she could take care of herself and that she drove three miles one way to visit her mother-in-law once per week. In fact, he divided this last point into two, and listed them separately, thus seemingly giving more support for his conclusions. Adams quite clearly testified that while she was able to take care of herself, she grew tired doing so. A person need not be completely bedridden before she becomes eligible for disability benefits. As for being able to drive three miles one way, the Court notes that this trip would take considerably less time than the twenty minutes Adams claims she can sit without becoming dizzy.
 
 
 31
 This present case is thus unlike Maziarz v. Secretary of Health and Human Services, No. 86-1967 (6th Cir. August 31, 1987) (per curiam), where this Circuit affirmed the ALJ's determination that the claimant's driving his four wheel Honda through the woods severely undermined his contention that his cervical condition restricted his driving. Also in Maziarz, the claimant complained of chest pain only when walking too hard, which was relieved upon rest, and did not occur too often. In contrast, Adams testified that her pains sometimes occurred for no reason, and that they sometimes lasted for several minutes, despite her taking nitroglycerin. These complaints were all substantiated by the findings of her treating physician, as well as to some extent by those of the non-treating physicians. Of course, a treating physician's conclusions are to be given greater weight, Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 536 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983); but in this case the conclusions are not inconsistent.
 
 
 32
 We conclude that the ALJ's determination that Adams is capable of performing sedentary work is not supported by substantial evidence.
 
 III
 
 33
 The Secretary correctly points out that Adams' claim that her disability onset date is July 16, 1979 is barred by res judicata. On July 29, 1983 an ALJ determined that Adams' disability had ceased. Adams did not appeal this decision, and is now barred from arguing its correctness. We reject, however, the Secretary's contention that Adams is barred from asserting an onset date earlier than July 29, 1983, the date of the first ALJ's decision. That ALJ specifically found that Adams' disability ceased as of October 1982, and that her period of eligibility ceased as of December 31, 1982; he made no findings as to anything which occurred after those dates.[1]
 
 
 34
 HHS regulations allow a claimant to assert an onset date up to one year previous to filing for benefits. See Social Security Ruling 83-20. Adams refiled for benefits on November 7, 1983. She thus may assert an onset date of November 7, 1982. Of course, if Adams actually received disability benefits through December 31, 1982, or through July 29, 1983, she is not entitled to a windfall; in that case, the Secretary should properly begin her new benefits from the day after she ceased receiving her old ones.
 
 
 35
 The judgment of the district court is reversed, and the case is remanded for further remand to the Secretary with directions to enter an order awarding benefits.
 
 
 
 *
 Honorable Ann Aldrich, Judge, United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 It is not legally incongruous to hold that although the ALJ found Adams to be not disabled on October 31, 1982, there could be substantial evidence to find her disabled as of November 7, 1982. Res judicata applies only to claims which were actually decided, and in any case where the question is on-going, e.g. disability or child support, a later court is not precluded from finding that circumstances have changed
 We recognize, however, that under the circumstances of this case, our holding may seem factually incongruous. We would only note that Adams was only one of a large number of claimants on disability whose benefits were terminated at about this same time. Although Adams did not appeal her termination of benefits, many others did, resulting in several class action suits in which the courts found that the Secretary's termination of benefits were unfounded, and in which they ordered the Secretary to reinstate those individuals who had not yet received final adjudications of their claims. See, e.g., Holden v. Heckler, 584 F.Supp. 463 (N.D. Ohio 1984).