991 F.2d 795
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
William J. HAMILTON, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellee.
 No. 92-1573.
 United States Court of Appeals, Sixth Circuit.
 April 9, 1993.
 
 Before MILBURN and RYAN, Circuit Judges, and COFFIN, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Claimant William Hamilton appeals the district court's judgment affirming the Secretary's denial of his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g) et seq. On appeal, the sole issue is whether substantial evidence supports the Secretary's finding that claimant's alcoholism does not prevent him from performing sedentary work. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Claimant applied for disability insurance benefits on September 28, 1987, alleging that he became disabled on May 15, 1987, due to a cardiac condition. The application was denied initially and on reconsideration. On July 8, 1988, a hearing was held before an Administrative Law Judge ("ALJ").
 
 
 3
 The ALJ issued a decision on October 3, 1988, finding that claimant was not disabled. Subsequently, the Appeals Council denied further review, and the ALJ's decision became the final decision of the Secretary. On March 13, 1989, claimant filed a complaint in district court seeking judicial review of the Secretary's final decision. After filing his complaint, claimant submitted additional evidence to the district court which suggested, for the first time, that claimant suffered from alcoholism. Claimant requested that the district court remand the matter to the Secretary for further proceedings in light of the new evidence.
 
 
 4
 On February 8, 1990, the district court remanded the case to the Secretary for further consideration, ordering the Secretary to determine the effects of claimant's alcoholism on his ability to perform substantial gainful activity. On December 18, 1990, a second hearing was held before the ALJ. On February 20, 1991, the ALJ issued a decision finding that claimant was not disabled.
 
 
 5
 Specifically, the ALJ found that claimant was status post a single coronary artery bypass and aortic valve replacement surgery, resulting in continuing complaints of chest pain provoked by exertion. The ALJ also found that claimant was an alcoholic. After finding that claimant's subjective complaints were self-serving, exaggerated, and without objective medical or nonmedical substantiation, the ALJ found (1) that claimant did not have an impairment or combination of impairments that met or equalled a condition set forth in the listing of impairments, and (2) that claimant had the residual functional capacity to perform sedentary work. Further, the ALJ found that claimant retained the ability to perform a significant number of sedentary jobs in the national economy, including sedentary security guard, inspection, and quality control jobs.
 
 
 6
 Subsequently, claimant attempted to submit additional evidence to the Appeals Council. On December 31, 1991, the Appeals Council declined to consider the evidence, noting that it was not submitted in a timely manner and would not have resulted in changing the hearing decision.
 
 
 7
 Thereafter, claimant commenced an action for judicial review of the final decision of the Secretary in the district court. On April 17, 1992, the district court granted summary judgment in favor of the Secretary. This timely appeal followed.
 
 B.
 
 8
 Claimant was 55 years of age at the time of the second ALJ decision. He is a high school graduate and also has a certificate of completion from a course in restaurant and hotel management at Wayne State University in Michigan. Claimant's past relevant work included working as a security guard, an inspector, and production worker. He worked consistently from 1957 until the alleged onset of his disability in 1987. From 1957 until 1987, claimant showed substantial earnings in almost every quarter. Claimant's past relevant work was performed at the light to medium exertional level.
 
 
 9
 On May 15, 1987, claimant was admitted to the hospital with a diagnosis of unstable angina and severe aortic regurgitation. He admitted upon admission to the hospital that he smoked three packs of cigarettes daily, drank ten cups of coffee daily, and drank at least 12 beers per week.
 
 
 10
 Subsequently, claimant was transferred to another hospital for a cardiac catheterization and a possible coronary vein bypass operation. Claimant underwent a cardiac catheterization with no complications on May 19, 1987. An x-ray taken on June 2, 1987, showed a slight prominence in the left ventricle of claimant's heart.
 
 
 11
 In view of the catheterization results, George B. Ghanem, M.D., recommended an aortic valve replacement with a saphenous vein bypass graft to the circumflex coronary artery. This surgery was performed on June 4, 1987. Claimant tolerated the operative procedure well, and, except for occasional irregular heartbeats which were eventually controlled by medication, claimant's postoperative recovery was described as smooth and rapid.
 
 
 12
 On June 4, 1987, a chest x-ray showed that the prosthetic valve was in place and that the pulmonary vessels were normal. However, there was some suggestion of left lower lobe atelectasis of the lung.
 
 
 13
 A Holter Monitor report from July 21, 1987, revealed that the rhythm of claimant's heart was predominantly normal. Basem Kayali, M.D., reported that there were some premature auricular contractions, which lasted for 20 beats without symptomatology. There was also some evidence that suggested ischemia. On September 15, 1987, Dr. Kayali administered a treadmill exercise test. Claimant exercised for nine minutes and 30 seconds on a Modified Bruce Protocol, achieving seven to eight METs (Metabolic equivalents). This test was eventually stopped because claimant complained of pain in his left knee. In October 1987, Dr. Kayali stated that claimant's history of chest pain was "vague" after surgery. However, claimant continued to complain of shortness of breath and chest pain following exertion. In April 1988, a Holter Monitor revealed moderate atrial ectopia (displacement or malposition of a chamber of the heart).
 
 
 14
 On March 23, 1989, claimant was admitted to Crittenton Hospital in Rochester, Michigan, for acute alcohol withdrawal and chronic alcoholism. He stated that he had a history of chronic alcoholism since age 21 and stated that he had been drinking heavily since the age of 35. He denied that he had experienced blackouts, hallucinations or seizures as a result of his alcohol consumption. While hospitalized, claimant underwent alcohol detoxification. His withdrawal symptoms included anxiety and shakes. In addition, claimant also told a therapist at the hospital that he had no job difficulties during his past 16 years at Chrysler and that he did not believe his job with Chrysler was jeopardized. R. 274. On March 25, 1989, claimant was discharged from the hospital and transferred to the Oxford Institute in Oxford, Michigan, a residential facility for the treatment of chronic alcoholism.
 
 
 15
 Upon admission to the Oxford Institute, claimant reported that by the age of 35, he was drinking 12 to 18 beers per day, which continued up until his hospitalization at Crittenton Hospital. Claimant denied having blackouts, and his withdrawal was not associated with hallucinations, convulsions or DTs (delirium tremens). Claimant's medical history included his June 1987 cardiac surgery which, he said, "cured his angina." R. 283. Claimant's physical examination was essentially normal, revealing only a cough with some sputum production. Claimant's EKG and liver function tests were normal.
 
 
 16
 During his treatment at Oxford, claimant began to accept his alcoholism and learned that he needed to build support systems and maintain positive relationships with other recovering people. Claimant also understood that he would need to terminate his relationships with friends who continued to drink. Claimant's treatment was described as "successful," and he was discharged from the Oxford Institute on April 15, 1989, with follow-ups to be held at a clinic and with Alcoholics Anonymous. On September 20, 1990, claimant's attorney sent a letter to the ALJ stating that claimant had not received any medical treatment since his release from Oxford Institute in April 1989. R. 361.
 
 
 17
 On October 17, 1990, myocardial thallium stress images of claimant's heart were normal. On that same day, claimant exercised for nine minutes and achieved 10.1 METs on a treadmill exercise test using the Bruce Protocol. The test was negative for ischemia, chest pain, and significant arrhythmias. Claimant had a normal blood pressure response to exercise, and his fitness level was average.
 
 
 18
 From August through October 1990, claimant was examined for complaints involving pain in his neck, lower back, and left leg. He complained of neck pain in the morning, which diminished with daily activity, and intermittent back pain. Claimant has a near normal range of motion in his neck and lower back. Subsequently, his physicians diagnosed degenerative disc disease in the cervical spine.
 
 
 19
 Following his April 1989 release from the Oxford Institute, claimant experienced seven months of sobriety. On November 17, 1990, he was admitted to St. John Macomb Center where he underwent two days of detoxification and medical treatment. On November 19, 1990, claimant was readmitted to the Oxford Institute. A physical examination performed at admission was normal except for decreased breath sounds and a very fine tremor of the distal upper extremities bilaterally. Claimant was alert, oriented, and cooperative. He had a worried affect, self-depreciation, and his insight and judgment were moderately impaired.
 
 
 20
 At Oxford Institute, claimant underwent ten days of group therapy and a daily session, for five days, regarding relapse. Claimant also participated in limited recreational therapy and attended Alcoholics Anonymous meetings five times weekly. He made moderate progress in residential therapy and in addressing his lack of knowledge regarding his chemical dependency and the impact it had upon his lifestyle. Claimant's doctors recommended that he have long-term treatment for his alcoholism. He planned to attend outpatient therapy at St. Joseph Hospital and to attend five to seven Alcoholics Anonymous meetings weekly. Claimant's prognosis was described as good so long as he followed his treatment plan and guarded if he did not follow the plan. Claimant left Oxford Institute and, on December 11, 1990, he was admitted to Sobriety House, a recovery and rehabilitation home for alcoholics.
 
 
 21
 At the July 8, 1988, hearing, claimant testified that he stopped working in May 1987, when he underwent his heart bypass surgery. He claimed that when he attempted to walk up a flight of stairs, he experienced shortness of breath and a sharp pain in the left side of his chest. The pain was usually relieved with nitroglycerin, but claimant admitted that it would subside in about 15 seconds without any action on his part. Claimant testified that he also experienced shortness of breath without any other symptoms. Claimant admitted that his doctor had advised him to stop smoking and was angry with him for not doing so.
 
 
 22
 Claimant testified that he also had difficulty standing because the vein used in his bypass surgery was removed from his right leg. Claimant estimated, however, that he could stand for one to two hours at a time. R. 44. He also testified that he had no problems with sitting, although he stated that his bad back restricted his ability to stoop, squat or kneel. Claimant further testified that he had no difficulty using his arms or hands and he estimated that he could lift up to 20 pounds on occasion.
 
 
 23
 Furthermore, claimant testified that three days each week he had to lie down for one or two hours. He testified that he had difficulty sleeping at night due to nerves and stress. Claimant admitted that he was able to care for his personal needs and perform simple chores such as making his bed.
 
 
 24
 Claimant also testified at the December 18, 1990, hearing. This was his first testimony concerning his alcoholism. Claimant testified that he started drinking when he was 24, but began drinking heavily at the age of 35 when his family broke up. Claimant testified that he stopped drinking when he underwent heart bypass surgery in 1987, but resumed drinking three to four months after the operation. He testified that by the end of that year, he was drinking 12 to 18 beers daily. Claimant stated that he entered the Oxford Institute in March 1989, because he was unable to control his drinking, was not eating properly, was losing sleep, and was having trouble with his memory. Following his release from the Oxford Institute, claimant did not drink for six to eight months; however, he subsequently resumed his drinking and was readmitted to the Oxford Institute in November 1990. Claimant stated that he drank with friends, but also was a loner. Claimant testified that he first realized in 1989 that he was an alcoholic. In addition, claimant testified that he did not drink before work or on the job. He testified that he would get drunk after work, then sober up, and go into work. Further, he testified that he "didn't miss too many times on my job working" due to his drinking. R. 232.
 
 
 25
 Elaine Tripi, a vocational expert, testified at both hearings. She described claimant's most recent job as a relief worker at Chrysler as exertionally medium and unskilled, and his past jobs as a security guard and an inspector were exertionally light and semi-skilled. At the July 1988 hearing she testified that a person with claimant's characteristics would be able to perform 2,000 sedentary security guard jobs and 5,000 "sedentary to limited light" jobs in the areas of inspection and quality control. At the December 1990 hearing, Tripi testified that claimant would be able to perform the jobs she had previously identified without vocational adjustment. She noted that continuous drinking would affect his ability to perform the jobs identified, but he would be able to perform the jobs if he suffered an intermittent, transient problem which could be controlled "in the right atmosphere with appropriate support."
 
 II.
 A.
 
 26
 Pursuant to 42 U.S.C. § 405(g), this court has jurisdiction to review the Secretary's decisions. Judicial review of the Secretary's decision is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary employed the proper legal standards in reaching his conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 535 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983). This court does not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984).
 
 
 27
 In determining whether the Secretary's factual findings are supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. See Born v. Secretary of Health and Human Services, 923 F.2d 1168, 1173 (6th Cir.1990). If supported by substantial evidence, the Secretary's decision must be affirmed even if a reviewing court would decide the matter differently, see Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir.1983) (per curiam), and even if substantial evidence also supports the opposite conclusion, see Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir.1986) (en banc). Moreover, this court will not base its decision on a single piece of evidence and disregard other pertinent evidence in making a substantial evidence review. See Mowery v. Heckler, 771 F.2d 966, 970 (6th Cir.1985).
 
 
 28
 A social security disability claimant bears the ultimate burden of proof on the issue of disability. See Richardson v. Heckler, 750 F.2d 506, 509 (6th Cir.1984). However, once a claimant makes out a prima facie case that he cannot perform his usual work due to his disability, the burden of proof then shifts to the Secretary to show that there is work in the national economy which the claimant can perform. See Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir.1985); Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980). The Secretary must prove that having considered the claimant's present job qualifications, such as age, experience, education, and physical capacity, as well as the existence of jobs to match those qualifications, the claimant retains the capacity to perform a different kind of job. See Young v. Secretary of Health and Human Services, 925 F.2d 146, 148 (6th Cir.1990); Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir.1990).
 
 
 29
 On occasion, the Secretary can satisfy his burden by relying on the medical vocational guidelines; however, where a claimant's functional limitations do not fit the pattern of the medical vocational guidelines, the testimony of a vocational expert may be used to satisfy the Secretary's burden of proof regarding the availability of jobs which claimant could perform. Young, 925 F.2d at 148-49. The grids are not fully applicable if the claimant suffers from a significant nonexertional impairment. See Damron v. Secretary of Health and Human Services, 778 F.2d 279, 282 (6th Cir.1985). A vocational expert is generally consulted where a claimant has significant nonexertional limitations. See Buck v. Bowen, 885 F.2d 451, 455 (8th Cir.1989); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir.1988). The testimony of a vocational expert must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. See Varley v. Secretary of Health and Human Services, 820 F.2d 777, 779 (6th Cir.1987).
 
 B.
 
 30
 Claimant argues that substantial evidence does not support the Secretary's finding that his alcoholism is not a severe impairment. The Secretary uses the following five-step analysis to determine if any individual is disabled within the meaning of the Social Security Act.
 
 
 31
 1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
 
 
 32
 2. An individual who does not have a severe impairment will not be found to be disabled.
 
 
 33
 3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the regulations, a finding of disability will be made without consideration of vocational factors.
 
 
 34
 4. An individual who can perform work that he or she has done in the past will not be found to be disabled.
 
 
 35
 5. If an individual cannot perform his or her past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.
 
 
 36
 Claimant asserts that because the ALJ determined that his alcoholism was not a severe impairment, the ALJ stopped the evaluation of his alcoholism at the second step of the five-step process. In this regard, claimant cites Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir.1985), for the proposition that "an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.' "
 
 
 37
 However, Farris is inapplicable to this case because the ALJ did not stop his consideration of claimant's alcoholism at Step 2 of the sequential evaluation process. Rather, the ALJ went through Step 5 of the process and determined that claimant retained the ability to perform sedentary work despite the combined effects of his cardiac and substance abuse impairments. Indeed the ALJ stated:
 
 
 38
 Considering the evidence of record, the undersigned finds that alcoholism does not significantly interfere with the claimant's use of judgement or ability to understand, carry out, or remember simple instructions or deal with changes in a routine work setting and, thus, that such impairment is non-severe and does not impose any nonexertional limitations on the claimant's ability to perform substantial gainful activity.
 
 
 39
 R. 205.
 
 
 40
 Furthermore, even though the ALJ did determine that claimant's alcoholism was a nonsevere impairment, the ALJ nonetheless followed the analysis required by the Social Security regulations. The regulations provide that, when determining whether a person who has multiple impairments is disabled, the Secretary will consider "the combined effect of all ... impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523 (1991). In this case, the ALJ found:
 
 
 41
 The claimant's cardiac impairment significantly limits his ability to meet the basic physical demands or work activity and, thus, it constitutes a "severe" impairment. The evidence shows, however, that this impairment is not attended by clinical findings that meet or equal in severity the requirements of any section of the Listing of Impairments. The claimant's alcoholism does not significantly limit his mental ability to do basic work activities and, thus, it is not a severe impairment, as defined in 20 C.F.R. 404.1521.
 
 
 42
 R. 203. Thus, before the ALJ found that claimant's alcoholism was a nonsevere impairment, the ALJ found that claimant had a severe impairment, his cardiac condition.
 
 
 43
 In Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir.1987), the claimant, Maziarz, argued that the Secretary erred in failing to find that his cervical condition constituted a severe impairment. However, the Secretary had already determined that Maziarz suffered from a severe impairment. Thus, this court stated that
 
 
 44
 [a]ccording to the regulations, upon determining that a claimant has one severe impairment, the Secretary must continue with the remaining steps in his disability evaluation as outlined above. In the instant case, the Secretary found that Maziarz suffered from the severe impairment of coronary artery disease, status post right coronary angioplasty and angina pectoris. Accordingly, the Secretary continued with the remaining steps in his disability determination. Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error.
 
 
 45
 Id. Consequently, in this case, the ALJ's failure to find that claimant's alcoholism constituted a severe impairment is not reversible error because the ALJ had already determined that claimant's cardiac condition was a severe impairment. Moreover, because the ALJ had already found a severe impairment, the ALJ properly continued through the remaining steps of the five-step sequential evaluation process, thereby considering claimant's alcoholism in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity.
 
 C.
 
 46
 During the course of his brief, claimant also argues that his alcoholism imposes greater functional restrictions than those found by the Secretary. Under current Social Security law, the mere fact of being an alcoholic will not by itself be the basis for a finding that an individual is or is not disabled. See Gerst v. Secretary of Health and Human Services, 709 F.2d 1075, 1078-79 (6th Cir.1983) (per curiam). The mere inability to control alcohol intake is not sufficient to allow for a finding of disability absent a serious interference with the claimant's normal day-to-day activities. See Smith v. Secretary of Health and Human Services, 893 F.2d 106, 110 (6th Cir.1989); LeMaster v. Secretary of Health and Human Services, 802 F.2d 839, 842 (6th Cir.1986) (per curiam). In Buress v. Secretary of Health and Human Services, 835 F.2d 139, 141-42 (6th Cir.1987) (per curiam), this court ruled that substantial evidence supported the Secretary's finding that a claimant, who was in treatment for chemical addiction and was not functionally limited as a result of his drug problem, was not disabled because the claimant's activities of daily living were not markedly restricted, and he was able to function socially, get along with others, and could complete tasks in a timely manner.
 
 
 47
 In his second opinion in this case, the ALJ evaluated claimant's impairment under § 12.09 of the listings. This listing covers substance abuse addiction disorders. See 20 C.F.R. Part 404, Subpart P, Appendix I, § 1209 (1991). Claimant met the requirements of § 12.04A by establishing the presence of alcoholism; however, he failed to show significant functional limitations as a result of his alcoholism.
 
 
 48
 Claimant has no restriction of the activities of daily living. He testified that he cared for his personal needs, made his bed, swept the floor, did his laundry, and cooked simple foods. R. 48. Furthermore, it does not appear that claimant has difficulties in maintaining social functioning. Notes from the Oxford Institute indicated that claimant had a significant number of friends that he described as "drinking buddies." Further, when claimant was advised that he would need to make new friends who did not drink, claimant was open to the idea of joining Alcoholics Anonymous as well as other organizations in order to make friends who did not contribute to his consumption of alcohol.
 
 
 49
 Further, the record contains no evidence of deficiencies of concentration, persistence or pace. A mental status examination performed at Crittenton Hospital revealed that claimant's orientation was appropriate. He was alert, and his memory, judgment, and insight were intact. Furthermore, even during claimant's period of heaviest drinking, his withdrawal symptoms consisted primarily of anxiety and shaking. R. 253.
 
 
 50
 Moreover, the record is also devoid of any evidence which would support a finding of deterioration or decompensation in work or work-like settings. On the contrary, claimant told a therapist at Crittenton Hospital that he had no job difficulties during his 16 years at Chrysler Corporation and that, while he was working, he did not believe his job was in jeopardy. Additionally, the record indicates that claimant stopped working at Chrysler because he was having cardiac surgery, not because of his alcoholism. Thus, despite his heavy alcohol consumption, claimant was able to work for many years. He apparently never drank on the job, and he neither sought nor received any outpatient or residential treatment for his alcoholism while he was employed. Furthermore, the medical evidence shows no physical impairments related to claimant's alcoholism, and there is no evidence of end organ damage or cirrhosis of the liver.
 
 
 51
 Accordingly, we hold that substantial evidence supports the Secretary's finding that claimant's alcoholism did not impose any nonexertional limitations on the claimant's residual functional capacity to engage in a full range of sedentary work. Therefore, substantial evidence supports the Secretary's finding that claimant is not disabled.
 
 III.
 
 52
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Frank M. Coffin, Senior Circuit Judge, United States Court of Appeals for the First Circuit, sitting by designation